COC SERVICES, LTD., Appellant,

v.

COMPUSA, INC., James Halpin, Grupo Carso, S.A. de C.V., Grupo Sanborns, S.A. de C.V., and Carlos Slim Helu, Appellees.

No. 05–01–00865–CV.

Court of Appeals of Texas, Dallas.

Aug. 26, 2004.

Rehearing Overruled Dec. 15, 2004.

P. Michael Jung, Strasburger & Price, L.L.P., Robert H. Mow, Jr., Bobby M. Rubarts, James Holbrook, Hughes & Luce, L.L.P., Dallas, B. Daryl Bristow, Stephen G. Tipps, Macey Reasoner Stokes, Houston, Samara L. Kline, Baker & Botts, L.L.P., Scott A. Scher, Dallas, for Appellant.

Robert Gilbreath, Theodore W. Daniel, V. Elizabeth Kellow, John A. Gilliam, Jenkins & Gilchrist, P.C., G. Luke Ashley, Timothy R. McCormick, Scott Patrick Stolley, Thompson & Knight, P.C., Dallas, Mike A. Hatchell, Mary H. Hatchell, Locke Liddell & Sapp, LLP, Austin, William V. Dorsaneo, III, Gibson, Dunn & Crutcher, L.L.P., Mark T. Josephs, John R. Clayton, Alan N. Greenspan, Jackson, Walker, L.L.P., Dallas, Jennifer Bruch Hogan, Richard Hogan, Hogan & Hogan, David M. Gunn, Beck, Redden & Secrest, Houston, David E. Keltner, Jose, Henry, Brantley & Keltner, L.L.P., Fort Worth,

William G. Whitehill, Joe B. Harrison, Stacy R. Obenhaus, Gardere & Wynne, L.L.P., Charles W. Gameros, Dallas, for Appellee.

Before Justices BRIDGES, O'NEILL, and FITZGERALD.

## OPINION

Opinion by Justice O'NEILL.

This case involves a franchise deal, which never came to fruition, to establish CompUSA stores in Mexico. CompUSA and COC Services, Ltd. entered into negotiations for a master franchise agreement (MFA) with COC as master franchisee. The MFA contemplated a Mexican entity as subfranchisee. Negotiations eventually included the Carso parties (defendants below), who decided not to become the subfranchisee. They bought CompUSA instead.

COC sued and obtained a jury verdict against CompUSA, its CEO James Halpin, and the Carso defendants. We resolve the issues and cross-issues as follows: (1) as a matter of law, the unexecuted MFA was not a binding, enforceable contract; (2) there is no evidence that the Carso defendants tortiously interfered with the unexecuted MFA; (3) there is no evidence that CompUSA complained of Halpin's actions concerning the MFA, thus Halpin cannot be personally liable for acts taken on the corporation's behalf; (4) CompUSA adequately pleaded its claim that the damage-limiting provision in the MFA barred COC's claim for lost profits, which did as a matter of law bar those claims; and (5) there is no evidence that CompUSA and Halpin tortiously interfered with COC's prospective business relations with the Carso defendants.

**Factual Background**

COC's argument that CompUSA intended to be bound to the unexecuted MFA depends largely on the acts and words of CompUSA's CEO, Halpin. COC's theory that the Carso parties tortiously interfered with the MFA depends on an elaborate linkage of some of the Carso parties' business decisions—and their timing—with certain statements by Halpin.

The three limited partners in COC are Lawrence McBride, Roger Cunningham, and Ronald Beneke. The Carso defendants are Carlos Slim Helú (sued individually), Grupo Carso, and Grupo Sanborns (collectively, "Carso" or "the Carso parties"). Grupo Carso and Grupo Sanborns are part of an enterprise, headed by Slim, that conducts numerous businesses in Mexico and encompasses retail, technology, and telecommunications (including Sears, Prodigy, and Telmex).

Starting in 1997, COC partner McBride obtained a succession of three letters of intent from CEO Halpin, on behalf of CompUSA, granting the right to submit candidates to participate in a potential master franchise agreement for all of Mexico. Each letter of intent expired when no viable third-party candidate emerged. On January 8, 1999, COC and CompUSA executed a fourth letter of intent (LOI). Attached to the LOI were a form of a master franchise agreement, a forty-three page document, and a form of license agreement for a single initial licensee (subfranchisee), who would be subject to CompUSA's approval. The LOI required that both the MFA and the initial licensee's agreement be executed before the LOI expired, or neither party would have any further obligation or liability with respect to the potential master franchise. At COC's request, CompUSA extended the LOI deadline twice but refused to extend it beyond December 31, 1999.

The MFA and licensee agreement were never executed.

In April 1999, Slim-related companies began acquiring stock in CompUSA. In early September 1999, Carso contacted COC to express interest in COC's franchising proposal. On September 10, Carso announced publicly that it had acquired nearly 15 percent of CompUSA's stock, which made Carso the largest single stockholder of CompUSA. Thereafter, all three parties were involved in two meetings. Slim's son-in-law, Arturo Elias, and COC arranged a meeting for September 14 in Mexico City. The Carso parties, including Slim, met with COC and Halpin. One of the purposes of the meeting was to discuss synergies between the Slim companies and CompUSA. Thereafter, Elias traveled to Dallas to meet with COC and Halpin, on September 22 and 23. According to COC, during those meetings they made a "handshake deal" with Elias to form a joint venture, and Elias successfully negotiated with Halpin for a reduction of one of the fees under the MFA. Elias went back to Mexico City and spoke with Slim's son, Carlos Slim Domit, who was chairman of the board for both Grupo Carso and Grupo Sanborns. During the next week Domit rejected the Carso–COC deal, but the Carso parties did not communicate that decision to COC.

In October 1999, COC approached Halpin, concerned that Carso had not returned any of its phone calls since the September meeting in Dallas. The focus of the conversation was on enticing Carso back to negotiations. Halpin suggested that COC might send a letter to Carso advising that COC was looking to other potential licensees. On October 29, McBride sent the letter, stating that COC would be pursuing other parties. This became known as the "prom letter" (through the analogy that COC was con-templating asking a prettier girl to the prom). Negotiations between Carso and COC never resumed.

CompUSA's board met on November 3. At the meeting, Halpin announced that CompUSA and Carso were talking, among other things, about franchising opportunities and opening stores in Mexico. This information was published in both the Dallas press and Mexican press. Days later, Halpin met with Slim and other company representatives in Mexico City to discuss Slim's interest in buying CompUSA outright. On November 10, Halpin assured McBride that any press references were to the same franchising arrangement COC was pursuing with Slim, but he noted that if COC's talks with Slim had terminated, it might be difficult, if not impossible, for COC to meet the December 31 LOI deadline.

In late November and through the first week of December, Grupo Sanborns made increasingly larger offers to purchase CompUSA, which Halpin rejected. On December 16, a representative of Grupo Sanborns met with Halpin in Dallas for further negotiations, but the negotiations halted. That same day, McBride sent a facsimile to Halpin presenting a new licensee candidate, an entity associated with the Gonzalez–Nova family, who owned a substantial Mexican business enterprise. McBride attached a three-page letter of intent between COC and Gonzalez–Nova. Halpin responded that he did not have enough information to evaluate the candidate. Negotiations between Grupo Sanborns and CompUSA resumed on January 3. That same day, COC filed this lawsuit. The negotiations eventually resulted in an agreed price and Carso's acquisition of CompUSA late in January.

A jury found favorably for COC. It found that CompUSA and COC intended to be bound to the MFA, that CompUSA

had breached the MFA, and that $90 million in damages for lost profits and $270 million in punitive damages were appropriate redress for the violations. On the damages question, the trial court granted judgment notwithstanding the verdict (JNOV) in favor of CompUSA. COC appeals the JNOV. The jury also found the Carso parties had tortiously interfered with the MFA, finding collective damages against them for $31.5 million in actual damages and $90 million in punitive damages. The Carso parties cross-appeal the judgment against them. The jury also found that CompUSA and Halpin tortiously interfered with the prospective business relationship between COC and the Carso parties. The trial court granted JNOV on that issue, and COC appeals that JNOV as well.

## I. Contract Formation

 We begin with the contract-formation issue, Carso's first issue on cross-appeal. The jury found in question A–1 that COC and CompUSA intended to be bound to the MFA.[1] Carso and CompUSA sought a JNOV on this issue, but the trial court left this finding undisturbed. In this section, we ultimately conclude that the MFA is not a binding, enforceable contract for at least two reasons. First, the MFA lacks price-related terms that are essential and thus, as a matter of law, the MFA does not constitute an enforceable contract. Second, and in the alternative, the evidence does not raise a triable issue of

fact on the matter of mutual intent to be bound to the MFA.

 We review questions of law de novo, applying the rule that a motion for JNOV should be granted when (1) the evidence is conclusive and one party is entitled to recover as a matter of law, or (2) a legal principle precludes recovery. *See Mancorp, Inc. v. Culpepper*, 802 S.W.2d 226, 227 (Tex.1990).

## The Letter of Intent

The Letter of Intent (LOI) states that it "evidences the mutual intention" of CompUSA (Company) and COC (Prospective Master Franchisee) to enter into a master franchise agreement for establishing computer stores in Mexico (Licensed Business). It contemplates a "single approved initial Licensee" to whom COC will grant licensing rights to develop and operate the businesses under a licensing agreement. The LOI states that the "parties have negotiated a form of International Master Franchise Agreement" (the MFA), and two forms of a License Agreement (one for the initial licensee and one for other licensees). Throughout, COC is referred to as "Prospective Master Franchisee," and the attached form agreements are called the "Proposed Agreements."

The key provision of the LOI grants COC the exclusive right to negotiate to establish stores in Mexico, subject to expiration on a set date.[2] It was undisputed

---

1. Notably, to support lost-profits damages, COC must show interference with the MFA, not the LOI. Interference with the LOI would support out-of-pocket damages but not lost-profit damages. *See John Wood Group USA, Inc. v. ICO, Inc.*, 26 S.W.3d 12 (Tex.App.-Houston [1st Dist.] 2000, pet. denied). Neither would a claim for promissory estoppel support benefit-of-the bargain damages. *Sun Oil Co. (Delaware) v. Madeley*, 626 S.W.2d 726, 734 (Tex.1981). "The damages recoverable by a party claiming estoppel are not

measured by the profits that such party's reliance led him to expect, but instead are limited to the amount necessary to compensate that party for a loss already suffered." *Id.*

2. That provision states,

4. *Exclusive Negotiations.* The undersigned acknowledge that each will expend time, expense and effort in the negotiations contemplated herein. Therefore, neither Company nor Prospective Master Franchi-

that the parties mutually agreed to extend the expiration date to December 31, 1999. Another provision disclaims liability absent timely execution of the proposed MFA and license agreement:

> The parties intend to execute the Master Franchise Agreement, License Agreement for the initial Licensed Business to be executed by the initial Licensee Entity ... or forms substantially similar thereto, on or before [the Expiration Date].

If those agreements were not timely executed, the parties had no further obligation concerning the potential franchise arrangement:

> However, in the event that the MFA [and] License Agreement for the initial Licensed Business to be executed by Initial Licensee Entity ... are not executed by Company and Prospective Master Franchisee for the Master Territory on or before [the Expiration Date] ... this Letter of Intent will expire, *and neither of the undersigned shall have any further obligation or liability hereunder with respect to a potential master franchise or license for the development and operation of the Stores* ....

(Emphasis added.)

The LOI also contains a merger clause:

> This Letter of Intent supersedes all prior related discussions and agreements between Company and Prospective Master Franchisee with respect to the subject matter of this Letter of Intent.

see will submit any proposal, engage in any negotiation, or enter into any understanding, combination or agreement with any other person or entity with respect to the establishment of any similar business in Mexico until after the Expiration Date....

3. The pertinent provision states,
 *Grant of Rights.* ... Franchisor [CompUSA] hereby grants to Master Franchisee the right to develop and operate, and to license

## The Master Franchise Agreement

The MFA, with an initial term of fifteen years, grants COC the right to be CompUSA's exclusive master franchisee for all of Mexico and requires the master franchisee to perform according to a Master Development Schedule. That is, COC had the right and the obligation to develop and operate the business in the territory.[3] The MFA, in turn, prohibited CompUSA itself from developing or operating licensed businesses in the territory or from authorizing anyone but COC to do so. COC was "solely responsible for identifying and selecting" any prospective licensee. CompUSA retained the right to approve prospective licensees, according to criteria set by CompUSA.

COC was obliged to pay CompUSA various fees, including a "continuing monthly fee," in the amount of one percent of the gross sales of all licensed businesses. COC also owed a nonrefundable "initial fee" of $250,000, payable "upon execution of the MFA," owing with respect to the two stores contemplated under the initial Master Development Schedule (Development Schedule). That schedule called for agreement on a minimum number of stores, their location, and a "Minimum Volume Requirement." The parties were to negotiate a new Development Schedule annually. A Store Opening Schedule required agreement on the opening date of each store in the Development Schedule.

the development and operation of, the Licensed Business in the Master Territory according to the Master Development Schedule ... set forth in Schedule 2.... Master Franchisee hereby agrees to cause the Licensed Business to be developed and operated in the Master Territory according to the Master Development Schedule and the other terms and conditions of this Agreement....

In sum, if both the MFA and a license agreement were not timely executed, COC's exclusive negotiation rights expired with no further obligations between the parties. If the MFA became binding before the LOI expired, COC would acquire full franchise rights for the fifteen-year term, which would thus supersede the LOI's "no-further-obligation" provision. Only one or the other agreement could be in effect at any given time.

**Lack of Essential Terms**

▮ Carso challenges the jury finding that COC and CompUSA intended to be bound to the MFA. Carso[4] argues that, as a matter of law, the MFA could not be a binding, enforceable contract because essential terms were lacking, including key terms concerning the size and price of the parties' complex prospective deal. The MFA required that the Minimum Volume Requirement (required sales volume per store) and the Store Opening Schedule both be "finally determined by the parties" and inserted in the MFA "no later than five (5) Business Days prior to the date this Agreement is executed." The initial Development Schedule, attached to the MFA, called for two stores, in Mexico City (with no address), but the column for the Minimum Volume Requirement remained blank. No dates were specified in the attached Store Opening Schedule.

Carso argues that the minimum sales volume requirement was critical, as it essentially set price and payment terms. It set a floor on the amount CompUSA would receive in monthly fees, which was calculated as a percentage of gross sales. The term was so critical CompUSA could declare a default if COC failed to achieve the required volume or if that term were not successfully agreed for any annual development period. COC responds that the

volume and store-opening terms were not critical, as the parties had consciously agreed not to finalize those terms "because the identity and business of the contemplated partner would affect the specifics" of those terms. See Scott v. Ingle Bros. Pac., Inc., 489 S.W.2d 554, 555 (Tex.1972) (parties may agree upon some terms and understand them to be an agreement, yet leave other terms to be decided later).

▮ Whether an agreement fails for indefiniteness is a question of law to be determined by the court. Castroville Airport, Inc. v. City of Castroville, 974 S.W.2d 207, 211 (Tex.App.-San Antonio 1998, no pet.); America's Favorite Chicken Co. v. Samaras, 929 S.W.2d 617, 622 & n. 3 (Tex.App.-San Antonio 1996, writ denied) (citing T.O. Stanley Boot Co., Inc. v. Bank of El Paso, 847 S.W.2d 218, 221 (Tex. 1992)). A contract, whether written or oral, must define its essential terms with sufficient precision to enable the court to determine the obligations of the parties. Estate of Eberling v. Fair, 546 S.W.2d 329, 333 (Tex.Civ.App.-Dallas 1976, writ ref'd n.r.e.). The parties must agree to the material terms of a contract before a court can enforce the contract. Stanley Boot, 847 S.W.2d at 221. "Where an essential term is open for future negotiation, there is no binding contract." Id.

▮ The trial court has no authority to ask the jury to supply an essential term in the contract that the parties were unable to complete by mutual agreement. Estate of Eberling, 546 S.W.2d at 334. Fatal indefiniteness in an agreement may concern the time of performance, the price to be paid, the work to be done, the service to be rendered or the property to be transferred. Glazner v. Haase, 61 S.W.3d 10, 15 (Tex.App.-Texarkana 2000) (examining

---

4. CompUSA, as appellee, also briefed the contract-formation issues, but for the sake of simplicity, we refer in this section to cross-appellee Carso as the arguing party.

definiteness requirement in statute-of-frauds analysis), *rev'd in part on other grounds,* 62 S.W.3d 795 (Tex.2001).

In arguing the MFA fails for indefiniteness, Carso relies in particular on two franchise cases to illustrate the primacy of the missing terms. In *Glazner,* the putative franchise agreement, consisting of a series of letters, did not mention a price to be paid, time of performance, terms of the sale, or number of locations. 61 S.W.3d at 15. The court concluded that the purported mutual promises of the parties were too imprecise to enable the court to determine the obligations of the parties. *Id.*

In *Jensen v. Taco John's International, Inc.,* 110 F.3d 525 (8th Cir.1997), the plaintiff sought to be an exclusive franchisee in Rochester, Minnesota. In discussions with Taco John's, the plaintiffs focused on a plan to open one store but believed that Rochester could support three stores. Taco John's stated it would "like to see four or five stores." *Id.* at 526. Plaintiffs responded they were willing to commit to four stores and would be underway to opening the second store within twelve months of opening the first one. The court held there was no contract because the parties never reached "a firm agreement on the number, timing, or location of the stores they were to open." *Id.*

We conclude that the Minimum Volume Requirement was central to the economics of the MFA. It set the minimum revenue stream owing to CompUSA, and a failure to meet that requirement was a default event. COC concedes the price term could not be agreed until the Mexican partner gave its input.[5] There was no evidence of a mutual understanding between COC and CompUSA (and a Carso licensee) as to the Minimum Volume Requirement.[6] Like the *Jensen* and *Glazner* courts, we will not supply an essential term that the parties did not or could not agree upon. Accordingly, the MFA lacks at least one essential term and thus is not enforceable, as a matter of law.

### No Fact Question on Intent to be Bound

We turn to Carso's alternative argument that the terms of the LOI, signed by both COC and CompUSA, are unambiguous and conclusively negate any intent to be bound to the unexecuted MFA. COC responds that the evidence of the parties' conduct raises a fact issue whether COC and CompUSA intended to be bound to the MFA. In this section, we ultimately determine that the evidence does not raise a triable issue of fact on intent. Applying a multiple-factor test from *John Wood Group USA, Inc. v. ICO, Inc.* 26 S.W.3d 12 (Tex.App.-Houston [1st Dist.] 2000, pet. denied), we conclude as follows: given the parties' explicit expression in the LOI not to be bound to the unexecuted MFA, and the lack of agreement on key terms, the

5. Moreover, the LOI reiterates the primacy of agreement with the price term by the initial Mexican licensee: neither COC nor CompUSA would have any further obligations unless the initial licensee timely signed a license agreement.

6. COC alludes to discussions between it and CompUSA's representative, Paul Poyfair, concerning the Minimum Volume Requirement. COC partner Cunningham testified as follows:

Q: And so on January 8, 1999, the parties had not agreed upon what the minimum volume requirement was going to be?

A: Well, no, that's not true. It's not true.

Q: Well, will you agree that it was not put in the January 8, 1999 form-

A: It was not in this form, but we've done a lot of work with Mr. Poyfair about the volume of the stores.

COC refers us to documents generated in 1998, before the LOI was signed and before the meetings with Carso. This is no evidence of any agreement on minimum volume under the MFA.

parties' purported "performance" of the MFA does not raise a fact issue whether there was mutual consent to be bound to the MFA.

### Ambiguity and Merger

COC asserts the evidence shows CompUSA intended to be bound to the MFA, despite its refusal to sign the document on January 8. It points to COC partner Cunningham's testimony that, at the time, the parties signed the LOI "in lieu of" executing the MFA at the instigation of CompUSA's lawyers, who mistakenly believed that they needed to make disclosures to the Federal Trade Commission before the MFA could be signed. Cunningham said, at that time "we wanted to sign the documents." When he pressed the point with Paul Poyfair, CompUSA's representative, Poyfair responded that "this is the deal." [7]

The courts will enforce an unambiguous instrument as written, and in the ordinary case, the writing alone will be deemed to express the intent of the parties. *Sun Oil Co. (Del.) v. Madeley,* 626 S.W.2d 726 (Tex.1981). Objective, not subjective, intent controls. *City of Pinehurst v. Spooner Addition Water Co.,* 432 S.W.2d 515, 518 (Tex.1968). Whether a contract is ambiguous is a question of law. *El Paso Natural Gas Co. v. Minco Oil & Gas, Inc.,* 8 S.W.3d 309, 315 (Tex.1999). "If a contract is worded so that it can be given a certain or definite legal meaning, then it is not ambiguous, and the court will construe the contract as a matter of law." *Sun Oil,* 626 S.W.2d at 732. Evidence of surrounding circumstances may be consulted, within limits, but simply as an aid

in the construction of the contract's language. *Id.* at 731.

When interpreting an integrated writing—one stating that all previous agreements between the parties are merged, or integrated, into the subject writing—the parol evidence rule applies to circumscribe the use of extrinsic evidence. *Id.* As reiterated in *Sun Oil,*

> parol evidence is not admissible to render a contract ambiguous, which on its face, is capable of being given a definite certain legal meaning. This rule obtains even to the extent of prohibiting proof of circumstances surrounding the transaction when the instrument involved, by its terms, plainly and clearly discloses the intention of the parties....

*Id.* at 732.

COC's argument ignores the import of the merger clause in the LOI, which states the LOI "supersedes all prior related discussions and agreements." Furthermore, we will not entertain extrinsic evidence—i.e., Cunningham's subjective understanding and Poyfair's response—to contradict the objective meaning of the LOI's language. The LOI required the MFA to be executed if it were to be binding, and it is undisputed that CompUSA never executed it.

### Preliminary Writing or Enforceable Agreement?

COC relies on three cases to overcome the significance of the explicit language of the LOI: *Foreca, S.A. v. GRD Development Co., Inc.,* 758 S.W.2d 744 (Tex.1988); *Scott v. Ingle Brothers Pacific, Inc.,* 489 S.W.2d 554 (Tex.1972); and *Murphy v. Seabarge, Ltd.,* 868 S.W.2d 929 (Tex.App.-

---

7. Cunningham testified as follows:
 "Q: How did Mr. Poyfair say, if he talked with you about it, by doing it this way, where he signs the letter [LOI] that says these are the documents and they are all attached that had been negotiated, what did he say whether that would be the intention to abide by those or not?"
 A: He said this is the deal.

Houston [14th Dist.] 1994, writ denied). In each case, the court concluded a fact question was raised on the issue whether the parties intended to be bound to an enforceable contract, despite contrary language in the parties' initial writing(s). Carso relies on *John Wood Group USA, Inc. v. ICO, Inc.*, in which the court held no fact issue was raised, given the parties' expressions of intent not to be bound in their letter of intent. 26 S.W.3d 12 (Tex. App.-Houston [1st Dist.] 2000, pet. denied).

Today's case is distinguishable from *Foreca*, *Murphy*, and *Scott*. In those cases, the parties contemplated there would be a later definitive writing to be drafted, approved, and executed, but none materialized. In contrast, in the instant case a formal document did materialize. Indeed, the two business parties, with the assistance of counsel, developed a forty-three page MFA. And CompUSA, the party sought to be charged with its enforcement, refused to execute it. Instead, the parties signed the LOI, the essence of which was to relieve the parties of any obligations concerning the potential master franchise transaction unless both the MFA and a licensee agreement were timely executed.

Carso argues that the instant case is analogous to *John Wood*, in which the John Wood Group negotiated to sell one of its subsidiaries to ICO and memorialized certain terms in a letter of intent. 26 S.W.3d at 15. After the deal fell through, ICO sued the John Wood Group for breach of contract based on the letter of intent. A jury awarded ICO contract damages. *Id.* at 16. The letter of intent specified that it did not address all of the terms the parties needed to agree upon to become binding and consummated. It stated that the parties had agreed on certain essential sale terms, but only certain enumerated terms were designated as "binding." *Id.* at 15.

Otherwise, the letter stated, "it is understood and agreed that this letter is an expression of the parties' mutual intent and is not binding upon them." *Id.* The court held that although the parties had reached tentative agreement on certain essential terms, they unambiguously expressed their intent not be bound by those terms until all of the terms had been agreed. *Id.* at 19. Thus, as a matter of law, there was no contract of sale to be breached and no fact issue for the jury. *Id.*

### *Partial Performance as a Factor*

We agree with Carso that this case is more like *John Wood* than the cases COC relies on. That, however, does not conclude the inquiry because *John Wood* did not involve issues of "partial performance." *Id.* at 20 (noting that "there is no issue of partial performance by either party"). COC argues that some time after the LOI was signed, through their partial performance of the MFA, the parties expressed their mutual intent to be bound to the MFA. Thus, COC asserts, the evidence of post-LOI conduct raises a fact issue on intent.

We note that courts will consider whether performance conforming to the terms of the parties' writings is probative of the issue whether there is a binding, enforceable contract. In *Scott*, the supreme court found significant that the party disclaiming an employment agreement had paid the other party according to the salary terms in a purchase agreement. 489 S.W.2d at 555. In *Murphy*, the disclaiming party had paid himself according to the terms of the writing, leading the court to conclude there was a fact question whether the parties intended those terms in the writing as an enforceable agreement. 868 S.W.2d at 933–34.

In contrast, the parties' alleged performance fell short of raising a fact issue in

*RHS Interests, Inc. v. 2727 Kirby Ltd.,* 994 S.W.2d 895, 899 (Tex.App.-Houston [1st Dist.] 1999, no pet.). RHS argued the parties had a binding real estate contract, even though their writings specified there was no binding agreement until the execution of an Earnest Money Contract and a "binding Purchase and Sale Agreement." *Id.* at 897, 899. In affirming the summary judgment that there was no sale contract, the court found it significant that the contract proponent never paid or tried to pay any earnest money. That RHS had spent money on preliminary inspections did not suffice to raise a fact question on intent to be bound. *Id.* at 900.

The *John Wood* court also acknowledged "partial performance" as one factor to consider in determining whether a fact issue on mutual consent is raised. 26 S.W.3d at 20. In dicta, *id.* at 18, the *John Wood* court cited approvingly to *Arcadian Phosphates, Inc. v. Arcadian Corp.,* 884 F.2d 69 (2d Cir.1989). The *Arcadian* court applied a five-factor test that looks to (1) the language of the agreement, (2) the context of the negotiations, (3) the existence of open terms, (4) partial performance, and (5) the necessity of putting the agreement in final form, as indicated by the customary form of such transactions. *Arcadian,* 884 F.2d at 72 (applying New York common law). It concluded that the first factor, the language of agreement, is the most important. *Id.*

The *Arcadian* case illustrates one application of the factor test. The parties executed a memorandum agreement for the sale of a fertilizer plant, specifying price, payment terms, the fixed assets to be purchased, and a closing date. It also called for negotiations on other items to be decided before closing. It provided that if negotiations for the sale failed, the seller would refund a deposit and repay any capital expenditures by the buyer. *Id.* at 70.

Negotiations continued. The seller referred to the arrangement as an "agreed-upon sale." The buyers made some improvements at the plant, and at one point the buyers were introduced to a supplier as the "new owners." Ultimately the parties disagreed over certain terms, the sale fell through, and the would-be buyer sued. *Id.* at 70–71.

The *Arcadian* court determined that it needed to look only at the first factor, the language of the memorandum. The memorandum made two references to the fact that the negotiations might fail and that a binding sales agreement had to be completed by a designated date. The court held that because "intent can readily be determined" by examining the parties' preliminary memorandum agreement, summary judgment against the contract proponent was appropriate "even though there was considerable partial performance." *Id.* at 73.

### Applying the Multiple–Factor Test

Applying the multiple-factor test, we look first to the language of the preliminary agreement. In the January 8 LOI, CompUSA and COC explicitly expressed their intent not to be bound to the MFA unless it and a license agreement were timely executed. The context of the negotiations, the second factor, always included a trilateral arrangement with a third party, the Mexican licensee. We have discussed the third factor, the existence of open terms, concluding that the open price-related terms in the MFA were key to the economic structure of the arrangement. It is undisputed that those price terms required agreement by all three parties, but the terms were left open.

We turn to the fourth factor, partial performance. We first note the scope of evidence we consider probative. We will not consider conduct consistent with performance of the LOI as probative

of performance of the MFA. Such evidence would not tend to prove the parties understood that the MFA, and not the LOI, was in effect. *See, e.g., Wiley v. Bertelsen,* 770 S.W.2d 878, 882 (Tex.App.-Texarkana 1989, no writ) (applying performance exception to statute of frauds; performance must be unequivocally referable to performance of alleged contract).[8]

It is undisputed that COC never performed its primary obligation under the MFA—to open stores according to a development schedule and to pay CompUSA monthly fees for each store. Moreover, a key indicator that the MFA was even consummated is lacking. Upon execution of the MFA, COC was required to pay the initial store-opening fee (listed as $250,000 in the draft MFA). The MFA made explicit that payment of the fee was in consideration for, among other things, "the territorial rights granted as a result of Franchisor's entry into this Agreement with Master Franchisee." Although Cunningham asserted COC was ready to sign the MFA, there is no evidence (and no assertion), that COC paid the initial fee. *See RHS,* 994 S.W.2d at 895 (that would-be buyer never paid earnest money, and owner never demanded it, demonstrated parties knew no sale contract was binding).

COC also argues its efforts to locate a suitable licensee constitute performance of the MFA, asserting that only the MFA, not the LOI, placed this "obligation" on COC. We note, however, that under the LOI, COC was obligated to "spend time,

expense and effort" in the contemplated negotiations, and COC would lose its exclusive-negotiation rights if both of the requisite agreements were not timely executed. Thus, COC's efforts to locate a licensee were consistent with performance of the LOI and not unequivocally referable to COC's performing under the MFA.[9]

Additionally, COC points us to evidence of Halpin's conduct to support its claim that CompUSA intended to be bound to the MFA, not the LOI. For example, COC posits that CompUSA sent to potential licensees materials indicating the MFA was already binding and that CompUSA acquiesced in materials COC prepared for potential licensees, which stated that "COC currently owns a CompUSA Master Franchise." COC also argues Halpin indicated the MFA was to be binding between them, because he stated in a meeting with COC and Carso that the COC partners were the "owners of the rights for the franchise in Mexico."

This evidence of CompUSA's purported performance of the MFA does not eclipse the other factors so as to raise a triable issue of fact on intent. Similar conduct in *Arcadian* fell short of the mark, where the owner introduced the would-be buyers to others as the "new owner." The court concluded, nonetheless, that there was no agreement to a sale contract based upon the language of the parties' memorandum. *Arcadian,* 884 F.2d at 71, 73 (given language in memorandum, disappointed pro-

---

8. We find cases applying the partial-performance exception to the statute of frauds helpful. The alleged performance must be "unequivocally referable to the agreement and corroborative of the fact that a contract actually was made." *Wiley,* 770 S.W.2d at 882. The alleged performance must be done with "no other design than to fulfill the agreement sought to be enforced." *See Teague v. Roper,* 526 S.W.2d 291, 293 (Tex.Civ.App.-Amarillo 1975, writ ref'd n.r.e.).

9. COC also points to evidence it paid for plane tickets to Mexico City for Halpin and Poyfair (a CompUSA employee) to attend the September 14 meeting. It asserts COC had that obligation only under the MFA, not under the LOI. This purported performance is insignificant in the context of a transaction the size of the one contemplated under the MFA.

ponent of the contract should not have believed that the other party intended to be bound). Similarly, COC knew the LOI granted it only exclusive-negotiation rights that were subject to expiration.[10]

Applying the *John Wood* multiple-factor test, we conclude the first factor—the language of the executed LOI—is the most important. There is no probative evidence to raise a fact question whether, through partial performance, the parties intended to abrogate the "no-further obligation" provision under the LOI and to be bound to the incomplete, unexecuted MFA. Accordingly, as a matter of law, the parties did not agree to be bound to the MFA. The jury finding to question A–1 must be disregarded.

Because there is no agreed MFA, COC's cause of action against CompUSA for breach of the MFA must fail, as does the cause of action against the Carso parties for tortious interference, there being no MFA with which to interfere. Given the size and complexity of this case, however, in the interest of judicial economy we make additional, alternative holdings on other issues raised by the parties.

## II. Carso's Alleged Tortious Interference with the Master Franchise Agreement

The jury found, in question A–5, that the Carso parties intentionally interfered with the MFA. In their second issue, the Carso parties argue that the trial court erred in not granting JNOV on this question, asserting the evidence was legally insuffi-

cient to support the jury's finding. COC's theory depends on a complicated linkage of inferences based on circumstantial evidence. We examine the record and ultimately conclude there is no evidence to support an inference that the Carso parties knowingly induced CompUSA to breach or otherwise interfere with the MFA. Neither is there any evidence that Carso's conduct constituted a cause in fact of harm to COC.

The elements of a cause of action for tortious interference with an existing contract are (1) the existence of a contract subject to interference,[11] (2) a willful and intentional act of interference, (3) such act was a proximate cause of damage, and (4) actual damage or loss occurred. *Browning–Ferris, Inc. v. Reyna*, 865 S.W.2d 925, 926 (Tex.1993). Ordinarily, merely inducing a contract obligor to do what it has a right to do under the subject contract is not actionable interference. *ACS Investors, Inc. v. McLaughlin*, 943 S.W.2d 426, 430 (Tex.1997).

A trial judge may properly grant JNOV when there is no evidence to support one or more of the jury's findings of fact necessary to the judgment. *Toles v. Toles*, 45 S.W.3d 252, 259 (Tex.App.-Dallas 2001, pet. denied) (citing *Mancorp, Inc. v. Culpepper*, 802 S.W.2d 226, 227 (Tex. 1990)). We determine whether there is any evidence upon which the jury could have made a necessary finding of fact. *Id.* We will sustain a no-evidence point of error when (1) the record discloses a com-

10. The issue is whether COC, knowing the terms of the LOI, could take literally Halpin's statement to a third party. It is a different matter whether the third party could rely on the literal meaning of Halpin's statement that COC owned the franchise rights.

11. We have concluded in the previous section that the MFA is not a binding, enforceable

contract. In reaching an alternative holding in this section, we assume for the sake of argument that the MFA is an existing contract subject to interference and analyze the sufficiency of the evidence to establish the other elements of the tortious-interference cause of action.

plete absence of evidence of a vital fact, (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence establishes conclusively the opposite of the vital fact. *Marathon Corp. v. Pitzner,* 106 S.W.3d 724, 727 (Tex.2003) (citing *Uniroyal Goodrich Tire Co. v. Martinez,* 977 S.W.2d 328, 334 (Tex.1998)).

■ To evaluate for legal sufficiency of the evidence to support a finding, we must determine whether the proffered evidence as a whole rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *St. Joseph Hosp. v. Wolff,* 94 S.W.3d 513, 519–20 (Tex.2003). We consider all the evidence in the light most favorable to the prevailing party, indulging every reasonable inference in that party's favor, but we need not disregard undisputed evidence that allows for only one logical inference. *Id.* To rise above a scintilla, the evidence offered to prove a vital fact must do more than create a mere surmise or suspicion of its existence. *Lozano v. Lozano,* 52 S.W.3d 141, 145 (Tex.2001). An inference stacked only on other inferences is not legally sufficient evidence. *Pitzner,* 106 S.W.3d at 728.

■ Circumstantial evidence may be used to establish any material fact, but it must establish more than mere suspicion. *Lozano,* 52 S.W.3d at 149 (citing *Browning–Ferris,* 865 S.W.2d at 928). Only reasonable inferences drawn from the known circumstances establish a material fact. *Id.* (inference is merely a deduction from proven facts). "By its very nature, circumstantial evidence often involves linking what may be apparently insignificant and unrelated events to establish a pattern." *Browning–Ferris,* 865 S.W.2d at 927. We consider the totality of the known circumstances in determining the legal sufficiency of the circumstantial evidence and the reasonable inferences to be drawn from it. *See Felker v. Petrolon, Inc.,* 929 S.W.2d 460, 464 (Tex.App.-Houston [1st Dist.] 1996, writ denied). A jury may not infer an ultimate fact from "meager circumstantial evidence" that could give rise to any number of inferences, none more probable than another. *Hammerly Oaks, Inc. v. Edwards,* 958 S.W.2d 387, 392 (Tex.1997). "[I]n cases with only slight circumstantial evidence, something else must be found in the record to corroborate the probability of the fact's existence or non-existence." *Pitzner,* 106 S.W.3d at 729.

■ In *Browning–Ferris,* the Texas Supreme Court provides considerable guidance on review of circumstantial evidence in a claim for tortious interference with contract. To establish an actionable "willful and intentional act" the evidence must show the defendant's influence and "knowing inducement" of the contract obligor's wrongful action. *Browning–Ferris,* 865 S.W.2d at 927. Evidence showing that the defendant was a mere "willing participant" does not suffice. *Id.*

Condor and Browning–Ferris (BFI) bid on four highway department contracts for street sweeping in Dallas. Three went to BFI and one to Condor. *Id.* About a month into the contracts, Condor's president, Louis Reyna, spoke with a highway inspector who said that he and his supervisor were "working with BFI to get [Condor] out of the contract" and that Condor would be declared in default under its contract "no matter what" Reyna did. *Id.*

The court concluded that the statement was sufficient to establish there was some "contact" between BFI and the department, but it did not describe clearly a willful act of BFI so as to constitute legally

sufficient evidence of interference to support the jury finding. The Court noted that the record was devoid of the slightest evidence that BFI "influenced" or was even aware of the State's apparently arbitrary conduct toward Condor. The Court examined the evidence of other alleged acts of interference, including vandalism against a Condor vehicle and an earlier collision between a BFI and Condor vehicle, stating, "No evidence was offered to show either BFI involvement with the equipment vandalism or BFI intent regarding the collision." *Id.* Condor argued that, nonetheless, the totality of the acts, when linked together, constituted sufficient evidence of willful acts of interference. Rejecting that argument, the Court stated, "To the contrary, we believe that some suspicion linked to other suspicion produces only more suspicion which is not the same as some evidence." *Id.*

**Exit–Strategy Comment**

 Under *Browning–Ferris*, to establish its cause of action, COC must show that the Carso parties knowingly induced CompUSA to breach the MFA or otherwise wrongfully interfered with the parties' ability to perform under the MFA and that such wrongful conduct proximately caused harm to COC. COC asserts that the Carso defendants willfully interfered with the MFA and induced CompUSA, through Halpin, to terminate the MFA wrongfully. COC asserts that from the beginning, Carso had a design to circumvent COC's rights, based on Slim's alleged investment scheme, evinced in part by a comment by Halpin. COC argues that as of April 1999, Slim directed the acquisition

of CompUSA stock, stopping just short of 15 percent ownership. If Slim-related companies owned more than that, Delaware law prohibited them from doing business with CompUSA for three years. On September 10, Slim companies announced their nearly 15 percent ownership, which made it CompUSA's largest stockholder. Slim's son-in-law, Arturo Elias, arranged for Slim to meet Halpin at the September 14 meeting, "to see what possible things they could do together in addition to the franchise." The September 14 meeting focused on how Slim could align his companies' interests with CompUSA's, with the COC deal getting little attention. Halpin and Slim had spoken the day before. That evening at dinner with the COC partners, Halpin told the partners they needed an "exit strategy," adding, "I've got mine, I hope you get yours."[12] COC asserts that because the Carso defendants were instrumental to Halpin's exit strategy (his golden parachute was triggered by a change in control), the jury could infer that they likewise were responsible for COC's need for one.

Even assuming Halpin's "exit strategy" comment[13] could support an inference that Halpin intended to circumvent COC's rights, it is far too attenuated to support an inference that the Carso parties committed an act of wrongful interference. It is undisputed that Carso had the right to acquire stock, indeed all of the stock, of CompUSA. There is no evidence that Carso wrongfully interfered with COC's alleged rights under the MFA through its

---

12. As a result of the merger, Halpin received $21 million from a "golden parachute" triggered by the change in control of CompUSA (e.g., payout of a salary multiple, bonus, vested stock options). Halpin estimated it yielded him $9.5 to $10 million after taxes.

13. Halpin explained that by "exit strategy" he merely meant that the COC partners should think how they would eventually convert a non-cash asset, i.e., their potential ownership interest in a joint enterprise with Carso, into cash. The jury, of course, was free to ignore Halpin's explanation.

investment strategy and early interest in establishing synergies with CompUSA.

**Secret Negotiations**

There is evidence that, through September and October, Halpin and Carso talked directly with each other. COC asserts the evidence shows Halpin lied to COC about this, denying he was in communication with Carso. During the last week of September, Carso rejected the COC deal but did not tell COC it was no longer interested. From this, COC infers that Carso and CompUSA were engaged in secret talks concerning a direct franchise arrangement intended to cut COC out of the deal.

We note that the MFA did prohibit CompUSA from consummating a direct franchising arrangement with Carso, but it did not prohibit Carso and CompUSA from talking about franchising. Indeed, the incomplete MFA mandated that Carso and CompUSA (as well as COC) reach agreement on key terms. Further, the fact that Carso and COC discussed franchising— even if they discussed a direct franchising relationship—is far too attenuated a "contact" to infer that Carso wrongfully induced CompUSA to breach COC's alleged master-franchise rights. Indisputably, CompUSA never breached the MFA by consummating a direct franchise relationship with Carso.

**Chilling the Market**

There is evidence that Halpin announced, at CompUSA's November 3 board meeting, that CompUSA and Slim were, among other things, exploring possible franchise opportunities, and that there-

after CompUSA and Carso announced the same to the press.[14] COC asserts that this publicity in November announcing Carso as potential franchisee "iced the market," chilling the possibility that COC could interest any other Mexican party in the deal.

We note first the contradiction in facts that COC attempts to prove with this argument. COC urges that the November press releases scared away potential franchise candidates. Nevertheless, COC produced the letter agreement with Gonzalez–Nova in December, after the press releases issued. And COC points us to no evidence of candidates solicited after the releases who rejected their overtures because of press reports.

COC's franchising expert, Donald Boroian, testified that the fall announcement in the press would probably scare away other Mexican companies. He reasoned the intimidation was because of "the sheer economic force of Grupo Carso," that others "would not have the financial or operational resources to compete." But Carso had publicly announced—on September 10— that it had acquired nearly 15 percent of CompUSA's stock, which made it the largest stockholder. There is no indication that Carso itself was prohibited from issuing its own public announcements concerning its ownership of stock in CompUSA and its interests in "investment possibilities."

Further, it requires pure speculation to infer that publicity in November about "possible franchise opportunities" was a substantial factor in causing COC's failure

---

14. COC points us to no direct evidence of the report in the Dallas press or any report in the Mexican press. A report dated December 8, 1999, by an analyst at Piper, Jaffray was read into evidence:

> According to CompUSA, talks over the past few weeks have included multiple investment possibilities, including an investment

in Cozone, CompUSA P.C., and possible franchise opportunities.

In addition, the Dallas Morning Star [sic] reports that Mr. Slim and CompUSA CEO Mr. James Halpin have also talked about opening stores in Mexico. We think that these discussions are preliminary and that nothing concrete has been decided.

timely to field a candidate, i.e., within the two-month period from November 3 until December 31. *See Marathon*, 106 S.W.3d at 727 (test for cause in fact is whether act or omission was a substantial factor in causing injury without which harm would not have occurred). It is undisputed that COC had been trying to field a Mexican candidate since 1997, when McBride obtained the first letter of intent from Halpin. Accordingly, there is no evidence of a wrongful act by Carso with respect to the press releases, which in turn was a cause in fact of COC's failure timely to present a suitable franchising candidate.

## The Master Franchise Agreement as a Deal–Breaker

According to COC, sometime in November Slim became interested in a buyout of CompUSA. Their negotiations halted in mid-December, the same day COC presented Gonzalez–Nova as an alternative candidate. On December 23, Halpin sent McBride a letter stating that CompUSA needed more information to evaluate the new candidate. CompUSA and Slim companies resumed negotiations in January, with the buyout consummated later that month. From this, COC asserts, the jury could infer that in mid-December Carso gave CompUSA an either/or choice, that it must reject Gonzalez–Nova and "wrongfully terminate" the MFA or Carso would not continue the negotiations—which in turn would thwart Halpin's golden-parachute opportunity.

The evidence COC advances to prove that Carso issued such an ultimatum is one comment by Slim and the cessation of negotiations on December 16. Slim testi-

fied that he did not want to be restricted, "never in anything." In context, this was his response when asked how he felt about statutory restrictions on stock purchases.[15] We conclude Slim's response to a question about statutory stock restrictions does not support an inference that he made Halpin's alleged rejection of Gonzalez–Nova a condition to continuing negotiations to buy the whole company. Neither does the break in Carso's negotiations support the inference that Carso induced Halpin to take wrongful action with respect to the MFA. This circumstance supports, at most, only mere suspicion that Carso improperly conditioned the buyout of the whole company on Halpin's breaching the MFA in some way.

COC urges that we must not fragment the evidence and conclude that no one piece supports the jury's finding; rather, we must view the evidence in the "totality of the circumstances." *See Lozano*, 52 S.W.3d at 149. We have concluded that each of the inferences necessary to COC's theory is not supported by the circumstantial evidence COC offers. As in *Browning–Ferris*, we reject the notion that the whole of the evidence in this case somehow equals more than the sum of its parts. 825 S.W.2d at 927. Viewing all disputed facts in the light most favorable to COC and in the totality of the circumstances, we conclude the evidence supports only mere suspicion or surmise. We are not empowered to convert mere suspicion or surmise into some evidence, and stacking unsupported inference upon unsupported inference will not establish evidence that is legally suffi-

**15.** Slim was asked if he knew about the three-year waiting period for his companies (*e.g.*, Sears, Prodigy, Telmex) to do business with CompUSA if he acquired more than 15 percent of the CompUSA stock This testimony followed:

Q: And you did not want to be restricted for three years from CompUSA doing business with your Mexican organization companies, including Sanborns, Sears, Telmex, and Prodigy, did you?
A: Like invest or we don't want to be restricted never in anything.

cient. *Id.* We conclude that there is no evidence to support a finding of "willful or intentional tortious conduct" by the Carso parties that caused any improper interference with the MFA. Accordingly, the jury finding that the Carso parties tortiously interfered with the MFA must be disregarded. The trial court erred in denying the Carso parties' JNOV on this question.[16]

## III. Liability of Corporate Agent

On question A–7, the jury answered affirmatively that CompUSA complained Halpin acted contrary to its best interest. In its second issue, COC complains that the trial court erred in granting JNOV in favor of Halpin on this issue. It further argues that a finding that the corporation complained is not a necessary legal predicate to finding Halpin personally liable for acts taken while a corporate agent. We ultimately conclude that (1) a corporate complaint is a necessary predicate to holding Halpin liable for acts taken as corporate agent, and (2) there is no evidence of a corporate complaint to support the jury's finding.

■■■ The acts of a corporate agent on behalf of the principal are ordinarily deemed to be the corporation's acts. *Holloway v. Skinner,* 898 S.W.2d 793, 795 (Tex.1995). To show interference with the principal's contract, the plaintiff must prove the agent acted solely in furtherance of his or her personal interests; this preserves the logically necessary rule that a party (e.g., a corporation) cannot tortiously interfere with its own contract. *Id.* at 796 (rule avoids converting ordinary breach of contract actions into tort actions). Agents are not liable for tortious interference with their principals' contracts merely because

they have mixed motives to benefit themselves as well as their principals. *ACS Investors, Inc. v. McLaughlin,* 943 S.W.2d 426, 432 (Tex.1997). Rather, the plaintiff must prove the agent acted "so contrary to the corporation's interests that his or her actions could only have been motivated by personal interest." *Id.* A corporate officer's desire to continue to receive compensation does not suffice to establish that an act was "solely" in the agent's own interest and contrary to the corporate principal's interest. *Holloway,* 898 S.W.2d at 796.

■■ We consider the corporation's evaluation of its agent's actions. *Powell Indus., Inc. v. Allen,* 985 S.W.2d 455, 457 (Tex.1998) (corporation is better judge of its own best interests than jury or court). If a corporation does not complain about its agent's actions, then the agent cannot be held to have acted contrary to the corporation's interests. *Morgan Stanley & Co. v. Tex. Oil Co.,* 958 S.W.2d 178, 181–82 (Tex.1997).

COC argues that a shareholder's derivative lawsuit, filed in January 2000, suffices as a corporate complaint about Halpin's acts that allegedly interfered with the MFA. COC points to evidence of a filing with the Securities and Exchange Commission concerning the proposed merger between Grupo Sanborns and CompUSA. That filing describes a shareholder lawsuit, the "Exner lawsuit," filed against the officers and directors of CompUSA "in connection with the proposed [m]erger," alleging that

> the individual defendants breached their fiduciary duties of loyalty and care to the Company and its shareholders by, among other things, entering into the Merger Agreement at an unfair price,

---

**16.** The jury also answered affirmatively that Halpin intentionally interfered with the MFA. The trial court granted Halpin JNOV on the question, and COC appealed that issue. We resolve a different issue concerning Halpin's liability and do not reach this issue.

failing to maximize shareholder value, and benefitting themselves at the expense of shareholders.

COC argues that this suit was sufficient to embrace a complaint about Halpin's allegedly tortious interference with the MFA because those acts were "inextricably intertwined" with the breach of fiduciary duty alleged in the Exner lawsuit.

 We disagree. Assuming *arguendo* that an inextricably intertwined requirement applies, there is no evidence in the record of the actual petition in the Exner lawsuit. Thus, there is no evidence from which to ascertain whether the Exner suit even mentioned the MFA. Accordingly, there is no evidence to support a finding that there was a corporate complaint about Halpin's actions with respect to the MFA.

COC also argues that the rule requiring a corporate complaint does not apply because members of the board of directors collectively received some $1.65 million as a result of the merger. Thus, COC asserts, the board could not be relied upon to question diligently the propriety of Halpin's actions with respect to the merger, relying on *Pace v. Jordan*, 999 S.W.2d 615 (Tex.App.-Houston [1st Dist.] 1999, pet. denied).

COC's reliance on *Pace* does not advance its argument. *Pace* discussed the requirement that the shareholder make demand of the board to bring suit on its own behalf, which is a prerequisite to a shareholder prosecuting a derivative suit. Even if COC had shown this was a "demand-futile" case because the board was not disinterested, there is no evidence a shareholder suit was ever brought that challenged Halpin's alleged interference with the MFA.

In sum, there is no evidence of a corporate complaint about Halpin's alleged acts of interference with the MFA. Absent a qualifying complaint, there can be no showing that Halpin, as CompUSA's corporate agent, acted solely in his own interest in his alleged tortious interference with the corporation's contract. Thus, acts taken on the corporation's behalf are deemed acts of the corporation, and Halpin cannot be held personally liable for them. The jury's finding that the corporation complained that Halpin acted contrary to its best interest must be disregarded. The trial court correctly granted JNOV in Halpin's favor on question A–7.

## IV. The Master Franchise Agreement's Provision on Limitation of Damages

In its third issue, COC urges the trial court erred in granting JNOV in CompUSA's favor on the jury's finding, in question A–4, that $90 million would compensate COC for CompUSA's breach of the MFA. COC argues that CompUSA failed to plead the damages-limiting provision in the MFA as an affirmative defense and thus waived any rights under that provision. Tex.R. Civ. P. 94. We ultimately conclude (1) CompUSA did not waive its affirmative defense based on the damages-limiting provision, and (2) that unambiguous provision did, as a matter of law, prevent COC's recovering lost-profit damages from CompUSA.

Again, we assume for the sake of this argument that the MFA is binding and enforceable. COC's petition alleges CompUSA breached the MFA and seeks damages for lost profits and punitive damages. CompUSA's Answer included a general denial, as well as the following statement, included in a section entitled "Affirmative Defenses":

Plaintiff's claims are barred, in whole or in part, by the language of the putative agreements relied upon by Plaintiff.

COC did not specially except to that statement. The damages-limitation provision, at page thirty-eight of the MFA, states:

*Punitive Damages.* . . . Franchisor, Master Franchisee and the controlling principals of Master Franchisee hereby *waive*, to the fullest extent permitted by law, any right to or claim, of any punitive, exemplary, incidental, indirect, special, consequential or other damages (*including, without limitation, loss of profits* ) against Franchisor . . . (whether such cause be based in contract, negligence, strict liability, or other tort or otherwise) and agree that in the event of a dispute, Franchisor, Master Franchisee, and the controlling principals shall be limited to the recovery of any actual damages sustained by it.

(Original in all capital letters; emphasis added).

CompUSA raised the damages-limitation issue in its motion for directed verdict at the close of COC's evidence, in its objections to the jury charge, and again in its motion for JNOV. COC complains there was simply no way it could have known from the statement in CompUSA's pleading that the provision limiting damages would be a basic issue in the suit. COC further asserts that CompUSA's failure to plead its reliance on the above-quoted provision prejudiced COC from having the opportunity to raise, prove, and submit defenses to the provision "such as the unenforceability of the provision due to the parties' unequal bargaining power, the ambiguity of the provision, or the unconscionability of the provision."

■ Texas follows a "fair notice" standard for pleading, which tests whether the opposing party can ascertain from the pleading the nature and basic issues of the controversy and what testimony will be relevant. *Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 896 (Tex.2000). "A petition is sufficient if it gives fair and adequate notice of the facts upon which the pleader bases his claim." *Id.* at 897. The rule's purpose is to give the opposing party information sufficient to enable him to prepare a defense. *Id.*

■ An opposing party should use special exceptions to identify defects in a pleading so the other party can cure them, if possible, by amendment. *Id.* Rule 90 of the Texas Rules of Civil Procedure governs special exceptions:

Every defect, omission or fault in a pleading either of form or of substance, which is not specifically pointed out by exception . . . shall be deemed to have been waived by the party seeking reversal on such account. . . .

Tex.R. Civ. P. 90. When a party fails to specially except, courts should construe the pleadings liberally in favor of the pleader. *Horizon*, 34 S.W.3d at 897.

■ COC's petition referred to the "1999 Agreement," which was the January 8 LOI with the attached MFA. COC asserted that as of January 8, the parties had agreed to the "Final MFA Document." CompUSA's statement of its affirmative defense referred to the language of the "putative agreements," in the plural, as barring COC's claims. Despite COC's assertion otherwise, the language of the provision in the MFA unambiguously stated that COC, as Franchisee, waived its rights to claim damages for lost profits—the very damages COC sought. We find it hard to imagine that COC was unaware of this damages-limitation provision or its import once it pleaded lost-profits damages for breach of the combined "1999 Agreement." We conclude that CompUSA's statement of its affirmative defense based on the language of the putative agreements gave fair notice that CompUSA would rely on the damages-limitations provision. To the

extent COC needed clarification or more specific information, it should have filed special exceptions.

■■■ COC's argument that it was prejudiced by CompUSA's "belated" reliance on the damages-limitation provision is not persuasive. The issues COC asserts that it would have pursued—unconscionability and ambiguity of the contract provision—raise legal questions for the court to decide.[17] *El Paso Natural Gas Co. v. Minco Oil & Gas, Inc.,* 8 S.W.3d 309, 315 (Tex. 1999) (whether contract is ambiguous is question of law); *Arthur's Garage, Inc. v. Racal–Chubb Sec. Sys., Inc.,* 997 S.W.2d 803, 815 (Tex.App.-Dallas 1999, no pet.) (whether contract is unconscionable is question of law). The trial court did permit the jury to decide the question of lost-profit damages, but it granted CompUSA JNOV on that question. COC had ample opportunity to present its legal arguments on unenforceability to the trial court in response to CompUSA's motion for JNOV. It did not argue those points. It asserted merely that CompUSA waived the point by not pleading it properly.

COC raises an additional argument. In its third amended answer, CompUSA repeated its affirmative-defense statements but added a section entitled "Facts Supporting Affirmative Defenses." Following a recitation of terms in the LOI, CompUSA stated, "Plaintiff's claims are barred by the language of the putative agreements relied upon by Plaintiff as Plaintiff was not granted the rights it claims and any rights conferred upon Plaintiff under the agreement have terminated." COC argues that the fact statement narrowed the scope of the asserted defense that COC's claims were "barred, in whole or in part, by the language of the putative agreements relied on by Plaintiffs." *Monsanto Co. v. Milam,* 494 S.W.2d 534, 536 (Tex.1973) (specific allegation of negligence controls general allegation of negligence).

COC's reliance on *Monsanto* is misplaced. In that case, the plaintiff alleged only one specific act of negligence, but the jury answered affirmatively on ten other specific acts, which were not pleaded. The purpose of the "fair notice" rule is to give the opposing party adequate notice of the facts to enable the opposing party to prepare a defense and to know what testimony would be relevant for trial. *Horizon/CMS,* 34 S.W.3d at 897. In contrast, CompUSA did not need to plead and prove additional facts to establish that the damages-limiting provision would, as a matter of law, defeat any lost-profits damages. The only "facts" that triggered the provision were those asserted by COC—that the MFA was binding and that COC was seeking lost-profit damages for breach of the MFA. The additional fact section in CompUSA's Answer merely expanded the Answer. It did not narrow or negate the separate affirmative-defense statement that the language of the putative agreements (in plural) barred the claims. That statement was sufficient to alert COC to file a special exception if it needed further elaboration on what specific language CompUSA contended barred plaintiff's claim.

We conclude that the trial court could properly grant JNOV on the basis that COC had contractually waived its right to lost-profit damages under the unambiguous damages-limitation provision. We resolve COC's third issue in CompUSA's

---

**17.** At trial, COC asserted there was no fact question on this issue for the jury to decide. When Carso referred to the provision during voir dire, COC's counsel objected, stating, "I will object. That is not pled. It is unenforceable. That's not a matter for the jury. It's not going to be an issue. There is no need to qualify the jury on that."

favor. The trial court's JNOV for Com-pUSA on jury question A–4 is affirmed.

## V. Tortious Interference with Prospective Business Relationship

■ In its first issue, COC complains of the trial court's granting CompUSA and Halpin JNOV on jury question B–1. That question asked whether Halpin or CompU-SA wrongfully interfered with COC's pro-spective contractual relations with Carso to develop and operate franchise stores in Mexico. The jury answered "yes" as to both defendants but the trial court granted JNOV. We ultimately conclude that there was no evidence to support a jury finding that Halpin and CompUSA tortiously in-terfered with COC's prospective business relationship with Carso based on fraud, defamation, or business disparagement.

■ The supreme court has ex-plained that to recover for the tort of interference with a prospective business relationship the plaintiff must prove that the defendant's conduct was "independent-ly tortious or wrongful." *Wal–Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 726 (Tex.2001). Conduct that is merely "sharp" or perceived as "unfair competi-tion" is not actionable as the basis for this tort. *Id.* After *Sturges*, the following for-mulation of the elements of the tort has been adopted:

(1) a reasonable probability that the parties would have entered into a con-tractual relationship;

(2) an "independently tortious or unlaw-ful" act by the defendant that prevented the relationship from occurring;

(3) the defendant did such act with a conscious desire to prevent the relation-ship from occurring or knew that the interference was certain or substantially certain to occur as a result of his con-duct; and

(4) the plaintiff suffered actual harm or damage as a result of the defendant's interference.

*See, e.g., Baty v. Protech Ins. Agency,* 63 S.W.3d 841, 859–860 (Tex.App.-Houston [14th Dist.] 2001, pet. denied); *Ash v. Hack Branch Distrib. Co.,* 54 S.W.3d 401, 414–15 (Tex.App.Waco 2001, pet. denied).

The second element of this tort requires that the independently tortious or wrong-ful act "prevented the relationship from occurring." The Texas Supreme Court has addressed the causation aspect of this ele-ment. *See Prudential Ins. Co. of Am. v. Fin. Review Servs. Inc.,* 29 S.W.3d 74, 83 (Tex.2000) (causation inquiry is whether defendant's alleged business disparage-ment caused injury to plaintiff's prospec-tive contracts); *Hurlbut v. Gulf Atl. Life Ins. Co.,* 749 S.W.2d 762, 767 (Tex.1987) (business disparagement case; statement must play a "substantial part" in inducing others not to deal with the plaintiff, result-ing in special damage, i.e., lost trade or other dealings).

■ We construe this element to require, at minimum, that the tortious con-duct constitute a cause in fact that pre-vented the prospective business relation-ship from coming to fruition in the form of a contractual agreement. The test for cause in fact, or "but for causation," is whether the act or omission was a substan-tial factor in causing the injury "without which the harm would not have occurred." *Doe v. Boys Clubs of Greater Dallas, Inc.,* 907 S.W.2d 472, 477 (Tex.1995).

### Fraud

COC argues that the evidence is legally sufficient to support the jury's finding based on the independent torts of fraud, defamation, and business disparagement, which CompUSA and Halpin allegedly committed. COC bases the fraud argu-

ment on the evidence that in October 1999, when COC approached Halpin with concerns that Carso had not returned any of COC's phone calls since the September 22–23 meeting, Halpin denied that he had been secretly negotiating a direct franchise deal with Carso. The focus of the conversation was on enticing Carso back to negotiations. Halpin suggested that COC send the prom letter, and thereafter negotiations between Carso and COC never resumed.

COC argues the evidence supports the following inferences: Halpin lied, and knew he was lying, when he said, or implied, that he was not secretly negotiating a direct franchise deal. Relying on Halpin's misrepresentation that he had not held secret franchising negotiations, COC took Halpin's advice and sent the prom letter. Therefore, Halpin and CompUSA's fraud resulted in the collapse of the prospective COC–Carso franchise licensing agreement.

We examine the evidence to ascertain whether, but for the allegedly tortious conduct, a franchising agreement between COC and Carso would have been formed. We note certain undisputed facts. COC's conversation with Halpin occurred in late October, over a month after the September meetings in Dallas. COC partner Roger Cunningham testified that COC's negotiations with Carso had terminated after the September meetings. In response to a question whether the talks had terminated by October 29, the date of the prom letter, Cunningham stated, "Well, when they don't call us back for more than a month, then I'd say the discussions have terminated." The entire text of the prom letter, sent after COC's consultation with Halpin, stated: "Our LOI[18] has expired

and we have not heard from you. We intend to pursue other candidates for the Mexican franchise."

Negotiations are a logically necessary precursor to contract formation. The letter did not purport to terminate negotiations, which undisputedly had ceased by the time of the prom letter. There is no evidence from which to conclude that, but for COC's having sent the letter, the licensing agreement with Carso would otherwise have come to fruition.

**Defamation and Disparagement**

COC also argues that Halpin, and thus CompUSA, defamed and disparaged COC to Carso when, during the second day of the Dallas meeting, Elias (Slim's son-in-law) and Halpin were alone. Elias asked Halpin why he had given the franchise opportunity to COC, and Halpin responded that he was helping a friend, McBride, who was "having some financial problems that was [sic] affecting his marriage." During the week of September 27, Domit (Slim's son and chairman of both Grupo Carso and Sanborns) decided not to go forward with the deal with COC.

The general elements of a claim for business disparagement are publication by the defendant of the disparaging words, falsity, malice, lack of privilege, and special damages. *Prudential,* 29 S.W.3d at 82. To maintain a cause of action for defamation, the plaintiff must prove that the defendant (1) published a statement (2) that was defamatory concerning the plaintiff (3) while acting with either actual malice, if the plaintiff was a public figure, or negligence, if the plaintiff was a private individual, regarding the truth of the statement. *WFAA–TV, Inc. v. McLemore,* 978 S.W.2d 568, 571 (Tex.

---

**18.** "LOI" here refers to the Memorandum of Understanding between Carso and COC, which ran 20 days, expiring on September 30.

1998). True statements cannot form the basis of a defamation complaint. *Randall's Food Mkts., Inc. v. Johnson,* 891 S.W.2d 640, 644 (Tex.1995). Whether a publication is capable of the defamatory meaning alleged by the plaintiff is initially a question of law to be determined by the court. *Turner v. KTRK Television, Inc.,* 38 S.W.3d 103, 114 (Tex.2000).

COC argues elsewhere in its brief that at the Dallas meeting they had worked out sufficient details with Elias to constitute a "reasonably probable" deal between COC and Carso. COC does not dispute that it was Domit (perhaps on instructions from Slim) who the next week decided against the deal. Thus, to conclude Halpin's remark prevented the prospective deal requires the following factual inferences: that Elias indeed conveyed the comment to the ultimate decision-maker in Mexico, and the decision-maker considered the comment so important to the deal that, but for Halpin's comment, Carso would have consummated the deal with COC.

We will assume for the sake of argument that Halpin's "help-a-friend" comment could disparage COC and that the "marital problems" portion of the comment could carry defamatory meaning and was false.[19] Nonetheless, there is no evidence that Halpin's comment was a cause in fact that prevented the deal. COC points us to no evidence that Elias inquired further or was even curious about the underlying facts concerning the comment. Nor does COC point us to any evidence that the Slim family was particularly sensitive about the personal marital problems of its potential business associates. Accordingly, the evidence does no more than create

a mere surmise or suspicion that the comment was a substantial factor in preventing Carso from making a deal with COC.

Even viewing all evidence in the totality of circumstances, we conclude that COC's slight circumstantial evidence fails to prove that it was more probable than not that CompUSA and Halpin's actions prevented the COC–Carso venture from occurring. *See Pitzner,* 106 S.W.3d at 729 (cases with only slight circumstantial evidence require something else to corroborate the probability of a fact's existence or non-existence). Accordingly, we conclude there was no evidence to support a jury finding that Halpin and CompUSA tortiously interfered with COC's prospective business relationship with Carso based on fraud, defamation, or business disparagement. Therefore, we resolve COC's first issue in favor of CompUSA and Halpin. The trial court's JNOV on question B–1 was proper.

## Conclusion

In sum, we resolve the issues and cross-issues as follows:

1. We resolve Carso's first cross-issue in its favor, concluding that as a matter of law the MFA was not a binding, enforceable contract.

2. We resolve Carso's second cross-issue in its favor, concluding there is no evidence that the Carso parties tortiously interfered with the MFA.

3. We resolve COC's second issue against it, concluding there is no evidence that CompUSA complained of Halpin's actions concerning the MFA,

---

**19.** Halpin's statement that McBride was having financial difficulties cannot itself supply the "defamatory" component of the defamation or disparagement claim because it was undisputed that McBride had had financial difficulties. McBride does dispute that he had "marital problems" but does not deny that he said anything to Halpin about the state of his marriage. Rather, he testified, "If there is any reference to marital problems, it's, I'm sure, taken out of context. Not every one has a great day every day."

Thus Halpin cannot be personally liable for acts taken on the corporation's behalf.

4. We resolve COC's third issue against it, concluding CompUSA adequately pleaded its claim that the damage-limiting provision in the MFA barred COC's claim for lost profits. We determine that unambiguous provision did, as a matter of law, bar those claims.

5. We resolve COC's first issue against it, concluding there is no evidence that CompUSA and Halpin tortiously interfered with COC's prospective business relations with Carso.

Accordingly, we **AFFIRM** the trial court's judgment that COC take nothing from defendants CompUSA and Halpin. We **REVERSE** the judgment against the Carso parties awarding actual and punitive damages. We **RENDER** judgment that COC take nothing on its claims against Grupo Carso, Grupo Sanborns, and Carlos Slim Helu.