# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-09-00495-CV

**Robert Wood, Appellant**

**v.**

**City of Flatonia, Appellee**

### FROM THE DISTRICT COURT OF FAYETTE COUNTY, 155TH JUDICIAL DISTRICT
### NO. 2007V-061, HONORABLE GLADYS M. OAKLEY, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Appellant Robert Wood filed suit against appellee the City of Flatonia (the "City") seeking a declaration of his rights and obligations under two written employment agreements between the parties. The City counterclaimed with its own request for declaratory relief interpreting the agreements at issue, specifically seeking a declaration that one of the agreements was invalid because, among other reasons, it was not properly authorized by the City Council. After a two-day bench trial, the trial court agreed with the City that the agreement was not properly authorized and rendered judgment in the City's favor. Wood now appeals, asserting that the agreement was a valid, binding contract. We will affirm the trial court's judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Wood began working for the City as city manager in 1999. As part of his compensation, Wood received a monthly car allowance. According to the 2003 Agreement For Professional Services and Employment as City Manager (the "2003 Agreement"), Wood was entitled to an allowance of $650 per month plus reimbursement for mileage. In October 2006, Wood learned of an accounting error that had resulted in his receiving twice the car allowance to which he was entitled for nearly three years. It is undisputed that Wood was overpaid a total of $22,750.

In December 2006, Wood advised the City Council that he would be resigning as city manager effective January 14, 2007. Prior to his resignation, Wood obtained outside counsel to draft an Interim Employment Agreement, which proposed that he would work off his debt to the City by acting as a consultant on a part-time basis for a period of five months, beginning after his resignation. Specifically, he would perform the duties and functions of city manager and assist in the training and transitioning of a new city manager, if one was hired. At the end of five months, the contract stated, Wood would have fully compensated the City and would owe nothing in the way of the overpaid car allowance. According to Wood, he and then-Mayor Robert Bizzell, who was aware that Wood was planning to change jobs and leave Flatonia, chose this approach from among a number of options for dealing with the overpayment issue because it was mutually beneficial to all parties. Wood presented the Interim Employment Agreement to the city council at its January 9, 2007 meeting.

This initial draft of the agreement contained several blanks regarding the amount of overpayment at issue, the address of the City-owned home where Wood's family resided, and the

2

details of two other provisions that are now in dispute.[1] Wood testified that he supplied some of the missing information himself in preparing the version of the contract that went before the city council.

The minutes for the January 9 council meeting show that the city council met in executive session for an hour and twenty minutes to discuss and act on "a personnel matter relating to the duties of the city manager." At the close of the session, council member Branecky moved "to authorize Mayor Bizzell to sign the employment agreement with the city manager as amended." Council member Milson seconded the motion, none opposed, and the motion carried. A typed version of the agreement, with no blanks remaining, was later signed by Mayor Bizzell.

In the weeks following this meeting, conflicts arose between the parties regarding the terms and enforceability of the Interim Employment Agreement. Several months later, Wood filed suit for declaratory judgment seeking declarations that the Interim Employment Agreement was valid and binding and that he had fully discharged his obligations under that agreement. The City counterclaimed, seeking declarations that the Interim Employment Agreement was invalid or, in the alternative, unconstitutional, and that the City was entitled to recoup the $22,750 overpayment under the 2003 Agreement.

One of the disputes at trial concerned what agreement, if any, the city council authorized at the January 9 meeting. In other words, Wood and the City each offered a version of this agreement, both of which were claimed to be the version authorized by the council on January 9. Wood's version appears to be a complete and "final" agreement, signed by Wood and Mayor Bizzell,

---

[1] The initial draft was admitted into evidence as Plaintiff's Exhibit 28 and Defendant's Exhibit 58.

while the City's version of what the council approved is unsigned, has three provisions with blanks that are not filled in, and contains handwritten notations in two places, apparently made by Mayor Bizzell at the January 9 meeting.[2]

In substance, the two documents vary with respect to paragraph one, which describes Wood's duties under the agreement and provides the number of hours that Wood was expected to work each month. Wood's version, Plaintiff's Exhibit 1 (also admitted as Defendant's Exhibit 55) states, in pertinent part:

> Employee agrees to faithfully devote his best efforts and the necessary time, energy, attention and abilities as necessary to perform his duties in a timely and productive manner; provided, however, the maximum number of hours Employee is expected to devote to his duties hereunder is 24 hours, on average, for each full month hereunder.

By contrast, the corresponding provision in Defendant's Exhibit 56 (also admitted as Plaintiff's Exhibit 8) reads as follows:

> Employee agrees to faithfully devote his best efforts and the necessary time, energy, attention and abilities as necessary to perform his duties in a timely and productive manner; provided, however, the maximum number of hours Employee is expected to devote to his duties hereunder is ____ for each full month hereunder and ____ hours for any partial months.

The blanks for the number of hours are not filled in.[3]

---

[2] Wood testified that the handwriting belonged to Bizzell, and Bizzell alternately testified that the handwriting "might have been" and "probably was" his own.

[3] The two documents also differ, technically, with respect to a provision determining how much Wood was obligated to pay the City in the event that he terminated the agreement before the expiration of the five-month term. The City's version includes a handwritten note (again,

At trial, Wood attempted to show that Plaintiff's Exhibit 1 represented the agreement "as amended" that was approved by the city council during the January 9 executive session—i.e., that his version, to the extent that it varied from the draft version presented to the council, simply memorialized the final terms that the city council discussed and agreed on during the meeting. The City, on the other hand, argued that, at most, the council approved the draft version represented by Defendant's Exhibit 56, but not the additional or modified terms contained in Plaintiff's Exhibit 1. After hearing both sides' evidence, the trial court signed a judgment in favor of the City declaring that the Interim Employment Agreement was unenforceable and that Wood owed the City $22,750 as a result of having been overpaid under the 2003 Agreement. The trial court further found that Wood was entitled to an offset of $5,537.44 and, therefore, owed the City $17,212.56. After both sides requested findings of fact and conclusions of law, the trial court ultimately issued the following material findings:

4. A proposed contract between the parties, known as the "2007 Interim Employment Agreement" (introduced and admitted into evidence as Plaintiff's Exhibit 28 and Defendant's Exhibit 58), was prepared.

. . . .

6. The City Council of the City of Flatonia approved the proposed "2007 Interim Employment Agreement" with some amendments (introduced and admitted into evidence as Defendant's Exhibit 58) as reflected in the minutes of the January 9, 2007 City of Flatonia City Council meeting, ("January 9, 2007 minutes") (introduced and admitted into evidence as Defendant's Exhibit 11).

---

presumably written by Bizzell) that Wood would be liable for an amount "to be determined at that time"; Wood's version contains a similar provision, but it is typed.

7. The proposed amendments to the "2007 Interim Employment Agreement" were hand written into the proposed "2007 Interim Employment Agreement" at the January 9, 2007 City Council meeting (introduced and admitted into evidence as Defendant's Exhibit 56).

8. The proposed "2007 Interim Employment Agreement" still contained some missing elements as of January 9, 2007 (introduced and admitted into evidence as Defendant's Exhibit 56).

Wood now appeals, arguing that the City is legally bound to honor the Interim Employment Agreement signed by Mayor Bizzell with the City Council's "express authorization," as reflected in the January 9 meeting minutes.

## DISCUSSION

On appeal, Wood argues that, under Texas law, the City Council's unanimous vote to approve the Interim Employment Agreement and the mayor's signature on the agreement are sufficient as a matter of law to bind the City and create an enforceable contract, under which the $22,750 overpayment to Wood was fully discharged. Citing *City of Bonham v. Southwest Sanitation, Inc.*, Wood argues that he need only show that the minutes reflect that the city council voted to authorize the contract at issue in order to bind the municipality and enforce the agreement. *See* 871 S.W.2d 765, 767 (Tex. App.—Texarkana 1994, writ denied) ("A plaintiff suing to establish a contract with a city has the burden to both plead and prove that the minutes show the council's act in authorizing or ratifying the contract."). Although we agree with Wood's general statement of the law, we disagree that the evidence shows conclusively that the version of the Interim Employment Agreement that he seeks to enforce is the contract that the City Council actually authorized.

6

Here, the trial court made a fact finding that the proposed amendments to the agreement that the council approved were the handwritten additions reflected in Defendant's Exhibit 56 and that this version "still contained some missing elements" after the January 9 executive session. In other words, the trial court implicitly found that the version of the agreement Wood now seeks to enforce—with its additional term regarding the 24-hours-per-month maximum—is *not* the version of the contract that was approved "as amended" by the council as reflected in the minutes.

When the appellate record includes the reporter's and clerk's records, as in this case, the trial court's findings, express or implied, may be challenged on appeal for evidentiary sufficiency. *Sixth RMA Partners v. Sibley*, 111 S.W.3d 46, 52 (Tex. 2003). We review a trial court's findings of fact for legal and factual sufficiency of the evidence by the same standards applied to a jury verdict. *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996). In reviewing the legal sufficiency of the evidence, we view the evidence in the light most favorable to the judgment, crediting favorable evidence if a reasonable fact finder could, and disregarding contrary evidence unless a reasonable fact finder could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 807 (Tex. 2005). We will sustain a legal-sufficiency complaint if the record reveals (1) a complete absence of evidence of a vital fact, (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence establishes conclusively the opposite of a vital fact. *Id.* at 810. In reviewing factual sufficiency of the evidence, we consider and weigh all of the evidence in the record, and we may overturn a judgment only if it is so against the great weight and preponderance

7

of the evidence as to be clearly wrong and manifestly unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). In a bench trial, the trial court is the "sole judge of the credibility of the witnesses and the weight to be given their testimony." *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex. 1986). The trial court may choose to believe one witness, disbelieve others, and resolve inconsistencies in any witness's testimony. *Id.* at 697.

The version of the agreement that the trial court found to be authorized by the council is referred to in the findings of fact as Defendant's Exhibit 56 (also admitted as Plaintiff's Exhibit 8). This is the version that includes several blanks, some of which are filled in with handwritten notes by Mayor Bizzell (including the handwritten term that, if Wood should terminate the agreement before its expiration, he will pay the City "an amount to be determined at that time"). According to Wood's testimony, these notes were written by Bizzell during the January 9 meeting when the city council went over the agreement "line by line" and ultimately voted to approve it. Wood testified that the substantive terms of the agreement were actually discussed and agreed to before the January 9 meeting, although the written agreement had not yet been drafted. On cross-examination, Wood testified further:

> Q. It's your testimony that council members sat there in that executive session and went through that contract line by line?
>
> A. We went through quite a few of the lines. I'm not saying we read every single one of them and talked about the language of every single line in that contract, but we went through that contract methodically and talked about all the issues.

8

Q.   But those were all issues that they had already told you were fine with them, were they not?

A.   Those were issues we had discussed, yes.

Q.   So why did they at that point in time have to look at it so carefully?

A.   I would—since they hadn't seen it before, I would think they wanted to make sure it said what they thought it said.

Q.   Was there any memorandum or memorialization of any kind of what those terms were to be?

A.   No.

. . . .

Q.   So are you telling me that prior to January 9, 2007, the council actually voted or made a decision in an executive session that, no, the solution is a contract to compensate you for services to be provided with moneys already paid?

A.   No.  They voted on January 9.

Q.   Well, how is it that you prepared this contract at the council's direction, if they hadn't ever voted on it?

A.   As it states in the notes that I gave them for the meeting, "I'm going to bring you a contract that contains the terms that we've discussed previously."

Q.   And whose idea was it to discharge the overpayment obligation in the manner set forth in the interim employment agreement?

A.   It came up in the discussions that we had.

Q.   By whom—who proposed it?

A.   I don't know.  Maybe I did, but it came up in the discussions.  And if they hadn't agreed with it, we would have stopped the discussion.

9

Three City council members, however, testified that they had not discussed the terms of the agreement before the January 9 meeting. Council member Bryan Milson testified that he did not recall being informed of or discussing the overpayment issue before the January 9 meeting, nor did he review any contract between Wood and the City prior to that meeting. As to what happened during the executive session, Milson testified that the council did not read over the contract line by line; rather, "it was went over in a—seemed to be—hasty manner, you know. Basically it was like we hit [the] high spots, and from the best of my knowledge, it was like a fill-in-the-blank kind of a deal. And from what I can remember of that contract, I never saw it but the one time when it was a fill-in-the-blank type contract." Similarly, council member Leonard Waska testified that the overpayment was never discussed during any December council meetings and that, because he was not present at the January 9 meeting, he did not know of the overpayment issue until Mayor Bizzell told him about it on January 11.

Council member Steven Morrill testified that the contract he remembered reviewing during the executive session "had some blanks" and "wasn't filled out," including a "dollar amount [that] was undecided." He testified that he could not remember writing anything down on his copy of the contract, which he had since destroyed, but that he expected the council probably went line by line over the contract during the executive session because they "had to get to some kind of an agreement for [Wood] to pay off the money." According to Morrill, all he could remember having been discussed during late December or early January meetings was that Wood would work off the overpayment over a five- or six-month period by doing "some work over the phone, in the office, in the office in the evenings" to keep tabs on the City's ongoing projects.

10

Mayor Bizzell identified Defendant's Exhibit 56 as a copy of the draft interim agreement that he presented to the city council on January 9. He testified that what came out of the meeting was an amended document, which was approved by the council. The amended and approved document, Bizzell testified, would have been taken to the city secretary, Melissa Brunner, after the executive session, and that he would have been the one to take it to her. He testified that he did not recall which document he delivered to Brunner. He testified further:

> Q. Now, if you left this meeting—if this is your copy of this contract that you left the meeting with on January 9, 2007, there's still some blanks in that document, are there not?
>
> A. That's correct.

Bizzell was then asked about the signed version of the agreement (Plaintiff's Exhibit 1/Defendant's Exhibit 55):

> Q. Okay. And that's the—a copy of that contract that you and Mr. Wood signed?
>
> A. Yes.
>
> Q. And did you bring this document back to the city council with all the blanks already typed in?
>
> A. That, I don't recall. I mean—
>
> Q. I'm sorry. Go ahead.
>
> A. It's possible either way.
>
> Q. Well, when did you sign—when did you and Mr. Wood sign the agreement?
>
> A. Well, I don't know. It's not dated.

Q. Well, you had one meeting on the 9th, and you had another meeting on the 12th. Did you have a meeting in between?

A. No.

Q. So this signed version was not presented to the council on the 9th, was it?

A. No. We discussed the draft on the 9th.

Q. And so the council never saw what was put into this contract after it was discussed on the 9th?

A. I can't say that, that they didn't.[4]

Bizzell further testified that he would not have signed the "final interim agreement," Plaintiff's Exhibit 1, if the council had not authorized him to do so.

No witness testified specifically as to whether the maximum-hours provision was discussed and agreed on either prior to or during the January 9 meeting. Therefore, the only evidence that Wood's proferred version of the agreement accurately reflected the council's will was his own testimony that the Plaintiff's Exhibit 1 simply memorialized terms that had already been agreed to. Although this testimony, coupled with the inferences that can be drawn from Bizzell's statement that he would not have signed the agreement if the council had not authorized it, is *some* evidence that Plaintiff's Exhibit 1 accurately represented the agreement, as amended, that the city council authorized, it is far from conclusive evidence. Indeed, contrary testimony suggested not only that the city council failed to consider and agree to every provision of the contract during the January 9

---

[4] Bizzell's testimony from his deposition was similar. He stated that he did not specifically remember seeing a particular draft version of the Interim Employment Agreement before the final version was signed, but that "whatever version we had at that council meeting" was read through closely, "line by line," during the executive session.

12

meeting, but also that they had never even heard of the overpayment issue giving rise to the need for the contract before that meeting. The trial court was entitled to—and did—resolve these conflicts in the evidence in favor of the City, finding that the amended agreement that emerged from the January 9 meeting is accurately represented by Defendant's Exhibit 56, which contains no term regarding the amount of time that Wood was expected to work, a fact that Mayor Bizzell confirmed in his testimony. Accordingly, under the trial court's findings, the agreement that Wood sought to enforce, in which this term is supplied, necessarily enlarged or modified the agreement reached at the city council meeting.

In view of the entire record, we conclude that there is more than a scintilla of evidence that the agreement Wood sought to enforce was not the agreement that the city council had authorized, and thus there was no meeting of the minds as to how many hours Wood was expected to work under the agreement—an essential term of this particular contract, *see COC Servs., Ltd. v. CompUSA, Inc.*, 150 S.W.3d 654, 664-65 (Tex. App.—Dallas 2004, pet. denied) (agreement that failed to specify work to be done, which "gave dimension" to payment terms and "was central to the economics" of the agreement, was indefinitely vague and unenforceable). The evidence is therefore legally sufficient to support the trial court's judgment. *See City of Keller*, 168 S.W.3d at 810. Moreover, having reviewed and weighed all of the evidence, we conclude that the findings supporting the judgment are not so against the great weight and preponderance of the evidence as to be clearly wrong and manifestly unjust. *See Cain*, 709 S.W.2d at 176. We overrule Wood's first issue and therefore need not reach his second issue regarding attorney's fees in the event of remand.

13

## CONCLUSION

We affirm the judgment of the trial court in favor of the City.

_____

J. Woodfin Jones, Chief Justice

Before Chief Justice Jones, Justices Puryear and Pemberton

Affirmed

Filed:   October 21, 2010