**Affirmed; Opinion Filed May 22, 2019.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-17-01304-CV

### THE FAN EXPO, LLC, Appellant
### V.
### NATIONAL FOOTBALL LEAGUE, Appellee

**On Appeal from the 44th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-16-04875**

## MEMORANDUM OPINION

Before Justices Myers, Osborne, and Nowell
Opinion by Justice Myers

The Fan Expo, LLC sued the National Football League (NFL) for tortious interference with a contract. The trial court granted the NFL's motions for summary judgment. Appellant, The Fan Expo, brings three issues on appeal contending the trial court erred by granting the NFL's motion for summary judgment because the evidence established a genuine issue of material fact concerning (1) intentional interference and (2) causation and damages, and because (3) the NFL did not conclusively establish its defense of justification. We affirm the trial court's judgment.

## BACKGROUND

Appellant was formed in 2015 for the purpose of hosting the National Fantasy Football Convention.[1] The first convention was to be held in 2015 at a casino resort in Las Vegas.

---

[1] Throughout the record and the briefs, the parties refer to the event as both the National Fantasy Football Convention and the National Fantasy Football Conference. The term "Convention" is used more frequently than "Conference," so we shall refer to the event as the convention.

Appellant invited numerous active NFL players to attend. However, the NFL warned the players that attendance at the event would violate the NFL's gambling policy and that the players could be subject to discipline. Appellant canceled the 2015 convention and sued the NFL.[2] The litigation was ongoing during the events in this case, which involved appellant's planning and preparation for the 2016 convention.

The 2016 convention was going to be a three-day event in July in California. According to Andy Alberth, appellant's executive director, the centerpiece attraction at the 2016 convention was going to be the EA Sports Madden NFL 17 video game, where attendees could play the game against NFL players.

On March 22, 2016,[3] Electronic Arts, Inc. (EA), the owner of the Madden NFL video game series, signed a "Sponsor Agreement" with appellant. The agreement provided that EA would be a "Participating sponsor" of the convention and pay appellant a sponsorship fee. The agreement did not state that EA would be a "partner." EA also promised to provide "artwork, assets and/or copy as is needed for [the Convention's] use solely in connection with this agreement." Appellant promised it would submit to EA any materials using EA's intellectual property for approval by EA before displaying them. EA sent appellant its logo for the Madden NFL 17 video game, which included the NFL's shield logo. However, appellant displayed the Madden NFL 17 logo on its webpage without first submitting the display to EA for approval. Appellant's webpage stated EA was a sponsor and partner for the convention.

The licensing agreement between EA and the NFL required EA to obtain the NFL's approval for all "promotion, publicity or display materials depicting the Licensed Marks," which

---

[2] *See Fan Expo, LLC v. Nat'l Football League*, No. 05-16-00763-CV, 2018 WL 1890144 (Tex. App.—Dallas Apr. 20, 2018, pet. denied) (mem. op.). After the cancellation of the 2015 convention, appellant sued the NFL for tortious interference with contract and tortious interference with prospective business relations. *Id.* at *2. The trial court granted the NFL's motion for summary judgment, and this Court affirmed the trial court's judgment. *Id.* at *2, 10.

[3] Unless otherwise noted, all dates are during the year 2016.

included the NFL's shield logo. Because appellant did not send the proposed display to EA for EA's approval, EA could not obtain the NFL's approval before appellant displayed the logo.

On April 18, Michael Buchwald, counsel for the NFL, viewed appellant's website and saw the Madden NFL 17 logo. On Friday, April 22, Buchwald and Allison Villafane, the NFL's senior counsel based in New York City, held a telephone call with EA's vice president of business affairs, Lee Rawles. During the phone call, either Villafane or Buchwald told Rawles that the NFL was in litigation with appellant. They also discussed appellant's display of the Madden NFL 17 logo without the NFL's authorization. Rawles said he did not know whether EA was involved in the convention, and he told Villafane and Buchwald he would investigate the matter. After the phone call, there were numerous e-mails among EA's personnel. The following Monday, April 25, EA's product manager, Moya Dacey, e-mailed appellant stating EA would not be participating in the convention.

The next day, April 26, appellant's lawyers sent an e-mail to the NFL's Dallas lawyers. The e-mail demanded that the NFL cease and desist from contacting sponsors of the convention, "demanding that they [the sponsors] withdraw from the event or intimidating them with the intent to make them withdraw from the event."

Several hours after the cease-and-desist e-mail, Villafane sent a "follow-up" e-mail to Buchwald and Rawles discussing the April 22 telephone call. The e-mail stated that during the telephone call, the NFL said it did not approve of appellant's promotional use of the NFL shield logo and requested "that EA take steps to have the NFL shield removed from the display." The e-mail also stated the NFL would not object to the "EA Sports Madden 2017" logo remaining on appellant's website as long as the NFL shield was removed. The follow-up e-mail also stated, "We [the NFL] reiterate that we have no issue with EA sponsoring or partnering with the NFFC [National Fantasy Football Convention] event. Our concern is with the NFFC's promotional use

of the NFL Shield, which may falsely give the impression that the NFFC is sponsored by, endorsed by, or otherwise affiliated with, the NFL, when it is not." Despite the NFL's assurance to EA that it had "no issue" with EA's involvement in the convention, EA did not immediately return to being a sponsor and participant in the convention.

On April 27, the day after appellant's cease-and-desist e-mail and the NFL's follow-up e-mail, appellant filed suit against the NFL for tortious interference with contract.

On June 14, appellant decided to cancel the convention. A week later, on June 21, EA's events manager sent an e-mail to appellant stating EA wanted to participate in the convention, but appellant told her the convention had already been canceled. In July, appellant amended its petition, adding EA as a defendant and suing it for breach of contract and, in subsequent amendments, fraud and other torts. In August, EA paid appellant the sponsorship fee.

Both the NFL and EA filed motions for summary judgment. Following multiple hearings, the trial court granted both the NFL's and EA's motions for summary judgment and ordered that appellant take nothing on its claims. Appellant appeals the summary judgment in favor of the NFL, but appellant does not appeal the summary judgment in favor of EA.[4]

## STANDARD OF REVIEW

The standard for reviewing a traditional summary judgment is well established. *See McAfee, Inc. v. Agilysys, Inc.*, 316 S.W.3d 820, 825 (Tex. App.—Dallas 2010, no pet.). The movant has the burden of showing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c). In deciding whether a disputed material fact issue exists precluding summary judgment, evidence favorable to the nonmovant will be taken as true. *In re Estate of Berry*, 280 S.W.3d 478, 480 (Tex. App.—Dallas 2009, no pet.). Every

---

[4] EA also filed a counterclaim against appellant. After the trial court granted EA's motions for summary judgment, but before the trial court signed the final judgment, appellant and EA filed a joint motion to dismiss their claims against each other. The trial court granted the motion and dismissed the claims.

reasonable inference must be indulged in favor of the nonmovant and any doubts resolved against the motion. *City of Keller v. Wilson*, 168 S.W.3d 802, 824 (Tex. 2005).

Rule 166a(i) provides that a party "may move for summary judgment on the ground that there is no evidence of one or more essential elements of a claim or defense on which an adverse party would have the burden of proof at trial." We review a no-evidence summary judgment under the same legal sufficiency standard used to review a directed verdict. *See* TEX. R. CIV. P. 166a(i); *Flood v. Katz*, 294 S.W.3d 756, 762 (Tex. App.—Dallas 2009, pet. denied). Thus, we must determine whether the nonmovant produced more than a scintilla of probative evidence to raise a fact issue on the material questions presented. *See Flood*, 294 S.W.3d at 762. When analyzing a no-evidence summary judgment, "we examine the entire record in the light most favorable to the nonmovant, indulging every reasonable inference and resolving any doubts against the motion." *Sudan v. Sudan*, 199 S.W.3d 291, 292 (Tex. 2006) (per curiam) (quoting *City of Keller*, 168 S.W.3d at 823). A no-evidence summary judgment is improperly granted if the nonmovant presented more than a scintilla of probative evidence to raise a genuine issue of material fact. *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003). "More than a scintilla of evidence exists when the evidence rises to a level that would enable reasonable, fair-minded persons to differ in their conclusions." *Id.* (quoting *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997)). "Less than a scintilla of evidence exists when the evidence is 'so weak as to do no more than create a mere surmise or suspicion' of a fact." *Id.* (quoting *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983)).

Under both standards, evidence favorable to the nonmovant will be taken as true. *In re Estate of Berry*, 280 S.W.3d at 480. The court indulges every reasonable inference in favor of the nonmovant and resolves all doubts in favor of the nonmovant. *City of Keller*, 168 S.W.3d at 824. We review a summary judgment de novo to determine whether a party's right to prevail is

established as a matter of law. *Tex. Workforce Comm'n v. Wichita Cty.*, 548 S.W.3d 489, 492 (Tex. 2018).

A summary judgment may be based on the testimony of interested witnesses if the evidence is "clear, positive and direct, otherwise credible and free from contradictions and inconsistencies, and could have been readily controverted." TEX. R. CIV. P. 166a(c). The phrase, "could have been readily controverted," does not mean that the movant's proof could have been easily and conveniently rebutted.

> Rather, it means that testimony at issue is of a nature which can be effectively countered by opposing evidence. If the credibility of the affiant or deponent is likely to be a dispositive factor in the resolution of the case, then summary judgment is inappropriate. On the other hand, if the non-movant must, in all likelihood, come forth with independent evidence to prevail, then summary judgment may well be proper in the absence of such controverting proof.

*Casso v. Brand*, 776 S.W.2d 551, 558 (Tex. 1989).

## TORTIOUS INTERFERENCE WITH CONTRACT

Appellant's three issues contend the trial court erred by granting the NFL's motion for summary judgment on appellant's claim for tortious interference with contract. The elements of a claim of tortious interference with an existing contract are: (1) an existing contract subject to interference; (2) a willful and intentional act of interference with the contract; (3) that proximately caused the plaintiff's injury; and (4) caused actual damages or loss. *Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000); *Tex. Integrated Conveyor Sys., Inc. v. Innovative Conveyor Concepts, Inc.*, 300 S.W.3d 348, 367 (Tex. App.—Dallas 2009, pet. denied). To establish the element of a willful and intentional act of interference, a plaintiff must produce some evidence that the defendant knowingly induced one of the contracting parties to breach its obligations under a contract. *Funes v. Villatoro*, 352 S.W.3d 200, 213 (Tex. App.—Houston [14th Dist.] 2011, pet. denied); *COC Servs. Ltd. v. CompUSA, Inc.*, 150 S.W.3d 654, 671 (Tex. App.—Dallas 2004, pet. denied).

**Intentional Interference by the NFL**

In its first issue, appellant contends it established a genuine issue of material fact on the element of intentional interference. The NFL asserted in its motions for summary judgment that it did not intentionally interfere with the contract between appellant and any sponsor of the convention, which would include EA, and that appellant had no evidence the NFL intentionally interfered with a contract between appellant and a sponsor of the convention. Under the NFL's no-evidence motion for summary judgment, appellant had the burden of coming forward with some evidence that the NFL intentionally interfered with the contract. We must determine whether appellant presented some evidence the NFL knowingly induced EA to breach its contract to participate in the 2016 convention. *See COC Servs.*, 150 S.W.3d at 671.

Because a defendant accused of tortious interference rarely admits its guilt, a plaintiff usually must use circumstantial evidence to prove its cause of action. *Dagley v. Haag Eng'g Co.*, 18 S.W.3d 787, 794 (Tex. App.—Houston [14th Dist.] 2000, no pet.); *Meza v. Serv. Merchandise Co.*, 951 S.W.2d 149, 152 (Tex. App.—Corpus Christi–Edinburg 1997, pet. denied). A fact issue is raised by circumstantial evidence if a reasonable person would conclude from the evidence that the existence of the fact is more reasonable than its nonexistence. *Guthrie v. Suiter*, 934 S.W.2d 820, 831–32 (Tex. App.—Houston [1st Dist.] 1996, no writ).

In this case, the NFL did not admit it intentionally interfered with the contract, nor did EA state it withdrew from the convention due to pressure from the NFL. Rawles, Villafane, and Buchwald, the participants in the phone call, testified that the NFL did not discourage EA from participating in the convention. They testified that Villafane and Buchwald told Rawles repeatedly that the NFL did not have a problem with EA participating in the convention. They also testified that Villafane or Buchwald said that the NFL was in litigation with appellant. They denied that the NFL coerced EA to withdraw from the convention.

Appellant argues that the e-mails by EA personnel after the phone call present some evidence that the NFL knowingly induced EA to breach the Sponsor Agreement and withdraw from the convention.

On Friday, April 22, after the phone call with Villafane and Buchwald, Rawles sent an e-mail to several people at EA, including Joss Price, with the subject line "Madden and the National Fantasy Football Convention." Rawles asked the recipients:

> Does this ring a bell for anybody? Did we do a deal with these guys? NFL is in litigation with them and it is an issue.
>
> Thanks,
>
> Lee

Price forwarded Rawles's e-mail to Randy Chase (EA's senior director of North American marketing) who responded:

> We had planned to have a booth at the show to promote MUT and Draft Champions. We were participating as a trade show, not partnering with them.
>
> Didn't know about the litigation. We can pull out of the show if it's an issue.

Rawles replied to Chase and numerous other EA employees including Moya Dacey (EA's product manager):

> At a minimum, we need to ask them to remove the logo. We didn't give them permission to reference us and we aren't their partner.

Rawles also said:

> Probably wouldn't hurt to avoid altogether if we don't already have significant sunk costs but the logo removal is a must.

Chase replied to Rawles, copying Dacey:

> Will do. Will get status on Monday and work to remove ourselves completely.

Dacey then e-mailed Sara Sprinkles (EA's events manager):

> FYI. We need to completely remove ourselves from the Fantasy Football Convention. I'll work with legal to see if there's anything from our end that has us covered. Worst case, we'll have to pay the [sponsorship] fee.

–8–

On Monday, April 26, Dacey wrote to Joe Chavez at appellant, stating:

> Joe,
>
> Not sure we've met via email yet, but I work with Sara and manage Madden in North America. It has come to our attention that there is an outstanding legal issue between the NFL and NFFC and as a direct partner of the NFL, EA will no longer be able to be . . . a participating sponsor in the Fan Expo. With that said, I am notifying the NFFC that we are terminating our Sponsor Agreement. Please remove our logo from any and all communications.

Andy Alberth, appellant's executive director, wrote back to Dacey:

> Hi Moya—
>
> We understand fully your concern about what is reported in news cycle as the press can use headlines to sell their product.
>
> However, we welcome a quick phone call to help any answers that you or your legal team may have as we under no circumstance want to mislead EA. We value our 12+ history in running some of America's top conventions and the reputation that bestows.
>
> We look forward to discussing.

Dacey replied:

> Andy,
>
> Happy to jump on a call to discuss, however, this isn't coming from press. It's coming from our Business Affairs team that is in conversations with the NFL, so not much wiggle room here.

The next day, April 26, appellant's lawyers sent the cease-and-desist e-mail to the NFL. Hours later, Allison Villafane, the NFL's senior counsel sent the following e-mail to Rawles and Buchwald, the other participants in the April 22 phone call:

> Subject: Follow-up
>
> Dear Lee [Rawles],
>
> As we discussed on our call on Friday, the NFL recently became aware of the use of the EA Sports Madden 2017 logo along with the NFL Shield design (the "Madden NFL Logo") without the NFL's approval in connection with an event called the National Fantasy Football Convention ("NFFC"). Specifically, the website for the NFFC displays the Madden NFL Logo on its partners page to

advertise EA Sports Madden 2017 as one of the NFFC's sponsors, exhibitors or partners . . . .

Pursuant to the terms of the Letter agreement between EA and the NFL, all promotional materials involving or using in any form or manner the Licensed Marks (including but not limited to the NFL Shield design) requires the NFL's prior approval. . . . The NFL does not approve of the NFFC's promotional use of the NFL Shield and therefore requests that EA take steps to have the NFL Shield removed from this display.

As we also discussed, any promotional use of the Licensed Products in connection with the promotion of a third party product or service requires the NFL's approval under the terms of our agreement. Since it appears EA has already moved forward with this promotional program with NFFC, however, the NFL will not object to the EA Sports Madden 2017 logo remaining on the NFFC website so long as the NFL Shield design is removed.

We reiterate that we have no issue with EA sponsoring or partnering with the NFFC event. Our concern is with the NFFC's promotional use of the NFL Shield, which may falsely give the impression that the NFFC is sponsored by, endorsed by, or otherwise affiliated with, the NFL, when it is not.

We also ask that if EA has authorized any similar use of the Licensed Marks by any other third parties without the approval of the NFL, that EA also take steps to have such use either approved by the NFL or discontinued.

We understand this may simply be a misunderstanding and we appreciate your cooperation. If you have any questions or would like to discuss further, please let me know.

Best Regards,

Allison

The next day, appellant filed suit against the NFL. That same day, Chase responded to an e-mail from a reporter and stated, "Once we learned that the NFL was in litigation with the show we cancelled our participation."

Appellant argues it presented evidence the NFL knowingly induced EA's breach of the Sponsor Agreement. The only act of interference appellant alleged in its petition was that the NFL "intentionally interfered with at least one contract by asking the sponsor(s) to cancel its/their contract(s)." Appellant's response to the motion for summary judgment and its argument on appeal allege the NFL intentionally interfered with EA's Sponsor Agreement when Villafane or

Buchwald told Rawles about the NFL being sued by appellant, which resulted in EA withdrawing from the convention.

In its brief, appellant points out that the NFL has financial power over EA as EA earns about a fifth to a sixth of its revenue from the Madden NFL video game series. Dacey testified in her deposition that EA's relationship with the NFL was more important than its relationship with appellant. Appellant then argues,

> Evidence also showed that the NFL used its economic power to influence EA. The NFL was in hotly-contested litigation with Fan Expo. The NFL's attorneys called EA, cited that litigation, and plainly suggested that EA should not do business with Fan Expo. And only a few days later, EA did exactly what it had been asked to do.

(Record citations omitted.)

The NFL's having economic power it could have used to influence EA is not evidence that it did so. It is uncontroverted that "[t]he NFL's attorneys called EA," and that Villafane or Buchwald mentioned to Rawles that the NFL was in litigation with appellant. But appellant then asserts the NFL "plainly suggested that EA should not do business with Fan Expo." There is no evidence that the NFL "plainly suggested that EA should not do business with Fan Expo." We must determine whether there is circumstantial evidence raising a fact question that the NFL knowingly induced EA to breach the Sponsor Agreement.

Appellant's argument appears to be that the NFL's plain suggestion was through Villafane or Buchwald telling Rawles that the NFL was in litigation with appellant and that after the conversation, Rawles and the other employees of EA felt they had no choice except to withdraw from the convention.

The only persons who could testify about whether the NFL, during the phone call with Rawles, knowingly induced EA's breach of the Sponsor Agreement were Villafane, Buchwald, and Rawles or anyone who spoke to them about the NFL's reason for mentioning the litigation. Villafane, Buchwald, and Rawles testified that Villafane or Buchwald told Rawles that the NFL

and appellant were in litigation, that Villafane and Buchwald were concerned about the unauthorized use of the Madden NFL 17 logo on appellant's website, and that they told Rawles that EA could participate in the convention as long as the NFL's logo was not displayed. None of this evidence shows the NFL knowingly induced EA to breach the Sponsor Agreement.

After Rawles got off the phone with Villafane and Buchwald, he sent the e-mail stating, "NFL is in litigation with them [appellant] and it is an issue." Rawles was asked about his "it is an issue" statement during his deposition, but his answers did not suggest intentional interference by the NFL:

> Q. You don't remember saying the litigation was an issue?
>
> A. That sounds familiar.
>
> Q. You think that's probably what you said?
>
> A. Yes.
>
> Q. Okay. So your e-mails didn't immediately say that Fan Expo, or whoever these people are, are violate—or causing us to violate a trademark agreement with the NFL, right? Your—your—issue in your e-mail was the litigation, correct?
>
> A. No. My issue in the e-mail was not the litigation. My e-mail may have mentioned the litigation. But what the NFL had made clear to me on the phone call was that the usage of the [NFL] shield in the logo was an unapproved usage and should come down. I explained to the NFL in the phone call that I wasn't aware that we were in business with these folks; I would look into it. And then I sent the e-mail I sent.

(Objections omitted.)

Viewing all the EA e-mails together demonstrates they are not circumstantial evidence that the NFL knowingly induced EA's breach of the Sponsor Agreement. This fact is demonstrated by Rawles's response to Chase's e-mail stating EA could "pull out" of the convention "if it's an issue"; Rawles responded, "At a minimum, we need to ask them [appellant] to remove the logo. We didn't give them permission to reference us and we aren't their partner." If the NFL had, as appellant argues, "plainly suggested that EA should not do business with Fan Expo," then EA's

–12–

"minimum" would have been withdrawing from the convention, not requiring appellant to remove the logo. Chase then explained to Rawles about the cancellation of the 2015 convention and told him, "I don't know that our participation is solidified." At this point, no one had told Rawles that EA had signed a contract to participate in the convention. Rawles then told Chase, "Probably wouldn't hurt to avoid altogether if we don't already have significant sunk costs but the logo removal is a must." This exchange shows Rawles's concern was appellant's unauthorized use of the logo. Rawles stated EA could consider "avoid[ing] altogether," but he did not say EA had to do so or that the NFL expected it to do so. Instead, he said, unaware of the Sponsor Agreement, that it "wouldn't hurt to avoid altogether" if EA does not have significant costs. Rawles left the decision whether to withdraw from the convention to Chase, who was not a participant in the phone call. Rawles did not insist that EA withdraw from the convention. These statements by Rawles indicate the NFL had not "plainly suggested that EA should not do business with Fan Expo."[5]

---

[5] Rawles testified in his deposition about the lack of coercion from the NFL to withdraw from the convention:

"Q. Did Ms. Villafane and Mr. Buchwald tell you that EA could still participate at the NFFC event?

A. Yes. They very clearly stated that to me. Their—their exclusive concern was the NFL shield.

Q. Did you believe that participation in the event would threaten or strain your relationship with the NFL?

A. No.

Q. You thought they'd be fine with it if you continued?

A. We—we have disagreed on many things. And to the extent that this was even a disagreement at all, this would not have been a problem.

. . . .

Q. Did you tell Ms. Dacey that the NFL told EA to cancel its participation? A. No. In fact, they—they said the exact opposite.

. . . .

Q. Did you tell Ms. Dacey that there wasn't any wiggle room on the decision to cancel?

A. I did not.

. . . .

Q. Did EA have a choice not to cancel the sponsorship? . . . Well, did they have to cancel?

A. No. . . . The only thing that the NFL instructed us to do, again because it had not been submitted for review and approval and, therefore, was an unauthorized use, was to remove the shield from that logo.

(Objections omitted.)

Chase and Dacey's e-mails indicate they decided EA would withdraw from the convention because of the litigation, but nothing in their e-mails shows the NFL intended that result or knew that such a result was likely. Dacey said in her e-mail to Alberth that EA's withdrawal from the convention was "coming from our Business Affairs team that is in conversations with the NFL, so not much wiggle room here." She testified in her deposition that "our Business Affairs team" was Rawles and that her only knowledge about the decision that EA would withdraw from the convention came from reading the e-mails quoted above. She testified that her statement to Alberth, "so not much wiggle room here," was an assumption she made based on Chase's statement in his e-mails with Rawles that EA would work to remove itself completely from the convention.[6] Chase was not part of the phone call, and no evidence showed he discussed the phone

[6] Dacey testified in her deposition:

Q. Okay. And you stated that this decision wasn't coming from the press, it was coming from the Business Affairs team; do you see that?

A. I do.

Q. Were you referring to Lee Rawles?

A. I was.

Q. Who else were you referring to?

A. Lee Rawles is the only person.

Q. And you stated that there was not much wiggle room; do you see that?

A. I do.

Q. What did you base that on?

A. The e-mail thread that I was on.

Q. And isn't that the e-mail thread where you didn't tell them that there was a signed contract in place?

A. Correct.

Q. So your indication there's not much wiggle room is not based anything other than that e-mail chain . . . ?

A. Correct.

Q. Look at this e-mail chain, and point me to the part that would indicate there's no wiggle room?

A. [Complies] Where it says, "We'll work to remove ourselves completely".

Q. You are talking about where Mr. Chase says that?

A. Yes.

Q. Is there any other part?

A. No.

Q. Okay. So, Mr. Chase's statement that, "EA would work to remove ourselves completely" is what you relied on in determining that there was no wiggle room, correct?

call with Rawles other than through the quoted e-mails. Therefore, neither he nor Dacey had any basis for suggesting the NFL encouraged EA not to do business with appellant and to withdraw from the convention or otherwise knowingly induced EA to breach the Sponsor Agreement. Nothing in the record indicates their e-mails can be interpreted as evidence the NFL knowingly induced EA to breach the Sponsor Agreement.

The evidence that Buchwald and Villafane mentioned the existence of the litigation to Rawles is not by itself evidence the NFL knew or should have known EA would breach the Sponsor Agreement on being told about the litigation. Appellant has not directed us to any other evidence that shows the NFL tortiously interfered with the Sponsor Agreement. We conclude the trial court did not err by granting the NFL's no-evidence motion for summary judgment. We overrule appellant's first issue.

---

A. Correct.

Q. And there's nothing else.

A. Correct.

. . . .

Q. Is it your understanding that the NFL requested that EA cancel its participation?

Q. Is that your understanding?

A. It is not my understanding.

Q. What is your understanding as to why EA had to cancel its sponsorship for the event?

A. My understanding is based on what's in this e-mail thread. That is my—that is all the knowledge that I have as to what decisions went behind it. I don't know what the conversations were, I don't know if there were any other conversations. All I know is what is typed in this e-mail.

Q. And the e-mail states that there is litigation, and that's an issue, correct?

A. Correct.

Q. Do you have any other understanding as to why EA canceled its sponsorship for the event, other than what's in that e-mail thread?

A. I do not.

Q. Is it your understanding that the NFL expressed any concerns regarding EA's participation at the event?

A. I don't have any knowledge about that.

(Objections omitted.)

Having overruled appellant's first issue, we need not address appellant's remaining issues.

*See* TEX. R. APP. P. 47.1.

## CONCLUSION

We affirm the trial court's judgment.

      /Lana Myers/
LANA MYERS
JUSTICE

171304F.P05



# Court of Appeals
# Fifth District of Texas at Dallas
## JUDGMENT

THE FAN EXPO, LLC, Appellant

No. 05-17-01304-CV     V.

NATIONAL FOOTBALL LEAGUE,
Appellee

On Appeal from the 44th Judicial District
Court, Dallas County, Texas
Trial Court Cause No. DC-16-04875.
Opinion delivered by Justice Myers.
Justices Osborne and Nowell participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is
**AFFIRMED**.

It is **ORDERED** that appellee NATIONAL FOOTBALL LEAGUE recover its costs of
this appeal from appellant THE FAN EXPO, LLC.

Judgment entered this 22nd day of May, 2019.